Nos. 23-3624 & 23-3627

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, et al.,
*Plaintiffs/Appellants*,
v.
BUREAU OF LAND MANAGEMENT, et al.,
*Defendants/Appellees*,

and

CENTER FOR BIOLOGICAL DIVERSITY, et al.,
*Plaintiffs/Appellants*,
v.
BUREAU OF LAND MANAGEMENT, et al.,
*Defendants/Appellees*

---

Appeals from the United States District Court for the District of Alaska
Nos. 3:23-cv-58 & 3:23-cv-61 (Hon. Sharon L. Gleason)

---

# FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR INJUNCTION PENDING APPEAL

---

TODD KIM
*Assistant Attorney General*

ROBERT J. LUNDMAN
THEKLA HANSEN-YOUNG
PAUL A. TURCKE
AMY E. COLLIER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 616-2625
amy.collier@usdoj.gov

Of Counsel:

MIKE GIERYIC
MIKE ROUTHIER
*Attorneys*
Office of the Solicitor
U.S. Department of the Interior

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................i

TABLE OF AUTHORITIES ............................................................................ iii

TABLE OF EXHIBITS ............................................................................ vii

GLOSSARY ............................................................................ viii

INTRODUCTION ............................................................................1

BACKGROUND ............................................................................3

A. Statutory Background ............................................................................3

1. The Naval Petroleum Reserves Production Act ..........................3

2. National Environmental Policy Act ..........................................5

B. BLM's Planning for the NPR-A ..........................................................5

C. The Willow Project ............................................................................6

1. The 2020 EIS and 2021 District Court Decision ........................6

2. The 2023 SEIS and ROD .........................................................8

D. Proceedings Below ............................................................................10

1. Preliminary Injunction Proceedings in March and April 2023 ............................................................................10

2. Summary Judgment Order and Appeal....................................11

E. Planned Construction Activities for 2023-2024................................13

LEGAL STANDARD AND STANDARD OF REVIEW .....................................14

ARGUMENT ............................................................................16

I. Plaintiffs are not likely to succeed on, and have not even raised serious questions going to, the merits....16

A. BLM's alternatives analysis satisfied NEPA. ....17

1. BLM considered a broad range of alternatives in the FSEIS and complied with the district court's 2021 order on remand. ....20

2. BLM properly understood its statutory authority and ultimately approved an alternative that produces less oil than ConocoPhillips's proposal. ....23

3. BLM's screening of alternatives satisfied NEPA. ....25

B. BLM's analysis of GHG emissions satisfied NEPA. ....29

C. BLM did not violate the NPRPA. ....32

II. Plaintiffs have not demonstrated a likelihood of irreparable harm while these appeals are pending. ....34

III. The district court's conclusion that the balance of equities and the public interest tip sharply against an injunction was not an abuse of discretion. ....38

CONCLUSION ....41

CERTIFICATE OF COMPLIANCE .... 43

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......... 15, 35

*Audubon Soc'y of Portland v. Haaland*,
40 F.4th 967 (9th Cir. 2022) .......... 18

*Burford v. Sun Oil Co.*,
319 U.S. 315 (1943) .......... 40

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) .......... 34

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) .......... 29

*City of Carmel-by-the-Sea v. U.S. DOT*,
123 F.3d 1142 (9th Cir. 1997) .......... 5

*City of L.A. v. Fed. Aviation Admin.*,
63 F.4th 835 (9th Cir. 2023) .......... 32

*Conner v. Burford*,
836 F.2d 1521 (9th Cir. 1988),
*reprinted as amended* at 848 F.2d 1441 .......... 6

*Doe #1 v. Trump*,
957 F.3d 1050 (9th Cir. 2020) .......... 15

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) .......... 38

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) .......... 34, 35

*Feldman v. Ariz. Sec'y of State's Off.*,
843 F.3d 366 (9th Cir. 2016) (en banc) .......... 14

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*,
725 F.3d 940 (9th Cir. 2013) .................................................................. 40, 41

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma*,
962 F. Supp. 2d 1230 (D. Or. 2013) ........................................................... 34

*Kunaknana v. Clark*,
742 F.2d 1145 (9th Cir. 1984) .................................................................... 33

*Mont. Wilderness Ass'n v. Connell*,
725 F.3d 988 (9th Cir. 2013) ...................................................................... 28

*Morongo Band of Mission Indians v. F.A.A.*,
161 F.3d 569 (9th Cir. 1998) ...................................................................... 18

*Munaf v. Geren*,
553 U.S. 674 (2008)..................................................................................... 14

*N. Alaska Env't Ctr. v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006) ....................................................... 3, 18, 27, 28

*N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*,
983 F.3d 1077 (9th Cir. 2020) ................................................................ 4, 33

*Neighbors of Cuddy Mountain v. Alexander*,
303 F.3d 1059 (9th Cir. 2002) ...................................................................... 5

*Res. Ltd., Inc. v. Robertson*,
35 F.3d 1300 (9th Cir. 1993) ...................................................................... 18

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)....................................................................................... 5

*Sovereign Iñupiat for a Living Arctic v. BLM* ("*SILA*"),
555 F. Supp. 3d 739 (D. Alaska 2021) ............................. 7, 20, 21, 24, 26, 30

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) .................................................................... 40

*Westlands Water Dist. v. Dep't of the Interior*,
376 F.3d 853 (9th Cir. 2004) ........................................................... 15, 18, 28

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)........................................................ 5, 13, 14, 15, 34, 38, 41

## Statutes and Court Rules

Administrative Procedure Act
5 U.S.C. § 706(2)(A) ........................................................................... 15

National Environmental Policy Act
42 U.S.C. § 4332(2)(C) ........................................................................... 5

Naval Petroleum Reserves Production Act
42 U.S.C. § 6504(a) ........................................................................ 19, 20

42 U.S.C. § 6506a.................................................................................. 33

42 U.S.C. § 6506a(a) ...................................................................... 19, 20

42 U.S.C. § 6506a(b) ........................................................... 3, 19, 20, 21

42 U.S.C § 6506a(k)(2) ........................................................................... 33

42 U.S.C § 6506a(n)(2) ........................................................................... 19

Pub. L. No. 94-258, 90 Stat. 303 ............................................................ 3

Department of the Interior Appropriations Act for Fiscal Year 1981,
Pub. L. No. 96-514, 94 Stat. 2957 (1980) ................................................ 3

## Federal Regulations

40 C.F.R. Parts 1500-08.............................................................................. 18

40 C.F.R. § 1502.14(a)......................................................................... 18, 25

40 C.F.R. § 1508.8(b) ................................................................................ 29

40 C.F.R. § 1508.28 ................................................................................ 31

43 C.F.R. Part 3130........................................................................................ 4

43 C.F.R. § 3131.3 ........................................................................................ 4

43 C.F.R.§ 3135.2(a)(1) ........................................................................... 33

43 C.F.R.§ 3135.2(a)(3) ........................................................................... 33

43 C.F.R. Part 3150 ........................................................................................ 4

43 C.F.R. Part 3160 ........................................................................................ 4

43 C.F.R. § 3162.3-1 ........................................................................... 4, 33

85 Fed. Reg. 43,304 (July 16, 2020) ......................................................... 18

87 Fed. Reg. 6,890-91 (Feb. 7, 2022) ......................................................... 8

87 Fed. Reg. 23,453 (May 20, 2022) ......................................................... 18

## TABLE OF EXHIBITS

| Exhibit | AR | Date | Description |
|---|---|---|---|
| Gov-Ex. 1 | AR820696-714 | Jan. 2023 | Willow Project FSEIS Executive Summary |
| Gov-Ex. 2 | AR820722-27 | Jan. 2023 | Willow Project FSEIS Chapter1: Purpose and Need |
| Gov-Ex. 3 | AR820729-54 | Jan. 2023 | Willow Project FSEIS Chapter 2: Alternatives |
| Gov-Ex. 4 | AR820756-80 | Jan. 2023 | Willow Project FSEIS Chapter 3: Affected Environment (excerpt) |
| Gov-Ex. 5 | AR821121-30 | Jan. 2023 | Willow Project FSEIS Chapter 3: Affected Environment (excerpt) |
| Gov-Ex. 6 | AR821709-12 | Jan. 2023 | Willow Project FSEIS Appendix B.5: SEIS Comments and BLM Responses (excerpt) |
| Gov-Ex. 7 | AR821906-171 | Jan. 2023 | Willow Project FSEIS Appendix D.1: Alternatives Development (excerpts) |
| Gov-Ex. 8 | AR824394-455 | Jan. 2023 | Willow Project FSEIS Appendix I.1: Avoidance, Minimization, and Mitigation |
| Gov-Ex. 9 | AR500740-47 | Jan. 2023 | U.S. Environmental Protection Agency Comments on Preliminary FSEIS |
| Gov-Ex. 10 | AR860402-07 | April 2022 | 2022 IAP ROD (excerpt) |
| Gov-Ex. 11 | AR505211-16 | Oct. 2022 | ConocoPhillips's History of Willow Master Development Plan (excerpt) |

## GLOSSARY

| | |
|---|---|
| BLM | Bureau of Land Management |
| CBD | Center for Biological Diversity (and other Plaintiffs/Appellants in No. 23-3624) |
| ConocoPhillips | ConocoPhillips Alaska, Inc. |
| EIS | Environmental Impact Statement |
| FWS | United States Fish and Wildlife Service |
| FSEIS | Final Supplemental Environmental Impact Statement |
| GHG | Greenhouse gas |
| IAP | Integrated Activity Plan |
| NEPA | National Environmental Policy Act |
| NPR-A | National Petroleum Reserve in Alaska |
| NPRPA | Naval Petroleum Reserves Production Act |
| ROD | Record of Decision |
| SEIS | Supplemental Environmental Impact Statement |
| SILA | Sovereign Iñupiat for a Living Arctic (and other Plaintiffs/Appellants in No. 23-3627) |
| TLSA | Teshekpuk Lake Special Area |

## INTRODUCTION

In March 2023, the Bureau of Land Management ("BLM") approved the Willow Master Development Plan ("Willow Project"), which authorized Defendant-Intervenor ConocoPhillips Alaska, Inc., to construct and operate infrastructure necessary to produce and transport oil and gas resources located in the National Petroleum Reserve in Alaska ("NPR-A"). Before approving the Project, BLM prepared an environmental impact statement ("EIS") and a supplemental EIS ("SEIS") pursuant to the National Environmental Policy Act ("NEPA"), which analyzed the environmental impacts of the proposed development. The Willow Project, as approved, is substantially scaled back from ConocoPhillips's proposal, with fewer drill sites and wells, reduced greenhouse gas emissions, less surface infrastructure, and lower anticipated oil production.

Two sets of environmental groups—led, respectively, by Sovereign Iñupiat for a Living Arctic ("SILA") and the Center for Biological Diversity ("CBD")—sued BLM, the United States Fish and Wildlife Service ("FWS"), and the National Marine Fisheries Service. Plaintiffs allege that Federal Defendants failed to comply with NEPA, the Naval Petroleum Reserves Production Act ("NPRPA"), the Alaska National Interest Lands Conservation Act, and the Endangered Species Act.

Last month, in a thorough 109-page decision on the merits, the district court meticulously reviewed and rejected all of Plaintiffs' claims. The court held that

BLM's 2023 SEIS remedied all errors identified by the court in its 2021 decision that had vacated BLM's 2020 approval of the Project. The district court later denied Plaintiffs' motion for an injunction pending appeal, which sought to halt ConocoPhillips's construction work anticipated to begin on December 21, 2023.

In April 2023, this Court denied motions from Plaintiffs seeking an injunction pending appeal from the district court's denial of a preliminary injunction. *See* ECF No. 27 (No. 23-35226). Plaintiffs are not entitled to an injunction pending appeal from the district court's final judgment either.

Plaintiffs only raise a subset of their claims and cursorily restate arguments they made below, without identifying any errors committed by the district court. Plaintiffs are not likely to succeed on the merits of their claims; they have not even raised serious questions going to the merits. The district court applied established principles of administrative law and concluded that BLM thoroughly analyzed the environmental impacts of the Willow Project and considered a reasonable range of alternatives, consistent with the requirements of NEPA and the NPRPA. The district court closely examined potential irreparable harm to Plaintiffs while these appeals are pending and correctly concluded that Plaintiffs had not established harm from ConocoPhillips's planned ground-disturbing work (oil production from Willow is still years away). And, after considering dozens of declarations filed by the Plaintiffs and Intervenors, the district court found that both the balance of the

equities and the public interest "tip sharply" against granting an injunction pending appeal. Plaintiffs do not show that this finding was erroneous. Their motions should be denied.

## BACKGROUND

### A. Statutory Background

#### 1. The Naval Petroleum Reserves Production Act

The 23 million acres that comprise the National Petroleum Reserve in Alaska were originally designated a naval petroleum reserve by executive order in 1923. *See N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006). In 1976, Congress enacted the NPRPA, Pub. L. No. 94-258, 90 Stat. 303, and placed the area under the Department of the Interior's jurisdiction. In response to the 1979 oil crisis and reflecting a desire to quickly move from federal to private oil development, Congress amended the NPRPA in 1980, directing the Secretary of the Interior to undertake "an expeditious program of competitive leasing of oil and gas in the [NPR-A]." Department of the Interior Appropriations Act for Fiscal Year 1981, Pub. L. No. 96-514, 94 Stat. 2957, at 2964-65 (1980). Congress directed that activities taken pursuant to the NPRPA "shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the" NPR-A. 42 U.S.C. § 6506a(b). Thus, "[t]he NPRPA

directs BLM to lease [NPR-A] land to private entities for oil and gas development, while taking such measures as BLM deems necessary or appropriate to mitigate adverse environmental impacts." *N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1081 (9th Cir. 2020).

BLM's oil and gas program in the NPR-A consists of three basic stages: leasing, exploration, and development. At the leasing stage, and through the development of an "integrated activity plan" ("IAP"), BLM determines which lands to make available for leasing, which lands to defer or make unavailable, and what special stipulations and other mitigation to apply programmatically to oil and gas activities to protect surface resources. Once BLM adopts such a plan, it may offer for sale and ultimately issue oil and gas leases in any area in which such leasing has been authorized, following the process outlined in 43 C.F.R. Part 3130.

The leasing stage is just the first step toward development in the NPR-A. Before any lessee may *explore* for oil and gas, it must obtain authorization under procedures set forth in 43 C.F.R. Part 3150 (governing geophysical surveys) and 43 C.F.R. Part 3160 (governing drilling operations). If a lessee discovers oil or gas, it may seek approval to *develop* the resources by submitting an application for a permit to drill that includes a drilling plan and a surface use plan of operations. *Id.* § 3162.3-1. At that stage, BLM may require additional project-specific stipulations to further protect surface resources. *Id.* § 3131.3.

### 2. National Environmental Policy Act

NEPA ensures that federal agencies take a "hard look" at the environmental impacts of proposed major federal actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); 42 U.S.C. § 4332(2)(C); *see also Winter v. NRDC, Inc.*, 555 U.S. 7, 16 (2008). The statute mandates no specific substantive results, *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002); it "merely prohibits uninformed—rather than unwise—agency action," *Robertson*, 490 U.S. at 351.

When an agency determines that a particular federal action will have significant environmental impacts, it must prepare an EIS. 42 U.S.C. § 4332(2)(C). On review, if a court concludes that an EIS "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences," and that its "form, content and preparation foster both informed decision-making and informed public participation," then NEPA is satisfied. *City of Carmel-by-the-Sea v. U.S. DOT*, 123 F.3d 1142, 1150-51 (9th Cir. 1997) (quotation omitted).

## B. BLM's Planning for the NPR-A

In 2012, BLM issued a combined IAP/EIS, which analyzed development scenarios and environmental consequences for all BLM-managed federal lands and oil and gas resources within the NPR-A. Gov-Ex. 1 at 1. BLM issued a Record of Decision ("ROD") approving that IAP in 2013. *Id.* BLM issued a revised IAP/EIS

in 2020, and after the 2020 plan was challenged, BLM issued a new ROD for the IAP/EIS in 2022 ("2022 IAP"). *See id.* The 2022 IAP, nearly identical to the 2013 IAP, makes 52 percent of the NPR-A available for oil and gas leasing and adopts lease stipulations and required operating procedures applicable to oil and gas activities like the Willow Project. Gov-Ex. 10 at 1; SILA-Ex. 1, ECF No. 10-2, at 47.

### C. The Willow Project

#### 1. The 2020 EIS and 2021 District Court Decision

BLM issued multiple non "no surface occupancy" (NSO) leases[1] in the Willow area to ConocoPhillips between 1999 and 2017, and after exploration drilling, ConocoPhillips announced discovery of oil and gas prospects in the Willow area in 2017. Gov-Ex. 11 at 6. In 2018, ConocoPhillips submitted its initial request that BLM approve its plan to develop oil and gas resources on the leases. Gov-Ex. 2 at 2. ConocoPhillips's proposal included five drill sites, a processing facility, gravel roads, and other infrastructure. *Id.* In 2020, BLM issued the Willow

---

[1] This Court has explained that non-NSO leases contain stipulations that "authorize the government to impose reasonable conditions on drilling, construction, and other surface-disturbing activities…[but] they do not authorize the government to preclude such activities altogether." *Conner v. Burford*, 836 F.2d 1521, 1524 (9th Cir. 1988), *reprinted as amended*, 848 F.2d 1441. Under that precedent, ConocoPhillips possesses certain rights to develop its leases, subject to reasonable regulation, including mitigation measures. *See* SILA-Ex. 24, ECF No. 10-25, at 13-14 n.58, 21 n.89.

Master Development Plan EIS ("2020 EIS") and FWS issued a Biological Opinion, both analyzing the proposal. *See Sovereign Iñupiat for a Living Arctic v. BLM* ("*SILA*"), 555 F. Supp. 3d 739, 752-53 (D. Alaska 2021). BLM subsequently issued a ROD ("2020 ROD"), which adopted ConocoPhillips's proposal of a project with five drill sites but deferred approval on two of those sites at ConocoPhillips's request. *Id.*

Two sets of nearly the same plaintiff groups in the instant suit challenged the 2020 EIS, ROD, and Biological Opinion, alleging—among other things—that BLM's environmental analysis did not comply with NEPA. In August 2021, the district court granted the plaintiffs summary judgment in part, holding that BLM violated NEPA. *Id.* at 805. Relevant here, the district court held that, in analyzing alternatives, BLM failed to acknowledge the extent of its authority under the NPRPA and to consider measures ensuring that greater protection be given to surface values within an area known as the Teshekpuk Lake Special Area ("TLSA"). *Id.* at 769-70. And the court concluded that BLM had improperly narrowed its analysis based on its view that ConocoPhillips had the right to extract all possible oil and gas on its leases. *Id.* The district court vacated BLM's approval of the Willow Project, and no party appealed.

### 2. The 2023 SEIS and ROD

Following the district court's 2021 decision, BLM began preparing a supplemental EIS ("SEIS") to address the identified deficiencies. 87 Fed. Reg. 6,890-91 (Feb. 7, 2022); SILA-Ex. 1 at 11-12. BLM published a Draft SEIS in July 2022, held numerous public meetings, and received extensive public comment. Gov-Ex. 1 at 3. BLM released the Final SEIS ("FSEIS") in February 2023, and approved the Willow Project in a ROD in March 2023. SILA-Ex. 1 at 24, 37.

In the FSEIS, BLM considered numerous new alternative concepts and analyzed four action alternatives in detail, including a new action alternative, Alternative E, which would approve three drill sites (sites BT1, BT2, and BT3), defer approval of a fourth (BT5), and disapprove a fifth (BT4). Gov-Ex. 3 at 1-5. BLM also considered different methods for the delivery of construction components to the remote area. *Id.* at 2, 18. The ROD approved the development of three drill sites (sites BT1, BT2, and BT3), as described in Alternative E, and the delivery of components using a river crossing (the Colville River Crossing module delivery option). SILA-Ex. 1 at 12-14. The ROD disapproved, rather than deferred, the fourth drill site (BT5), explaining that disapproving both BT4 and BT5 "reduces the overall period of construction activities, which tend to involve more intense impacts to subsistence activities and wildlife including caribou." *Id.* at 21.

Alternative E and the Colville River Crossing allow less construction of surface infrastructure and "would result in fewer overall environmental impacts—including impacts to important surface resources, subsistence uses and resources, and the climate—than the other action alternatives and module delivery options and therefore is considered by BLM to be the environmentally preferred alternative." *Id.* at 18-19. The modification of Alternative E selected in the ROD, by disapproving rather than deferring the fourth drill site (BT5), further reduces infrastructure and impacts to surface resources, subsistence uses and resources, and the climate. *Id.* at 19, 21. The ROD further explained that the selected alternative "reflects careful consideration of the Secretary's statutory directive to provide maximum protection to significant surface values within the NPR-A (i.e., Special Areas)" by requiring "less surface infrastructure, primarily within the TLSA," resulting in reduced "impacts to wetlands and vegetation, hydrology, gravel resources, and wildlife" and diminishing "potential impediments to the movement of caribou and subsistence users." *Id.* at 19.

The 2023 FSEIS also substantially expands the discussion of greenhouse gas ("GHG") emissions and climate change. *See* Gov-Ex. 4 at 2-23 (new text highlighted in yellow). The FSEIS presents quantified predictions for multiple GHG emissions streams related to the Willow Project for each action alternative and quantifies downstream combustion GHG emissions resulting from the

predicted change in domestic and foreign oil consumption. *Id.* at 15 (Table 3.2.7), 16 (Table 3.2.8). BLM's climate change analysis includes discussions of observed, *id.* at 3-4, and projected, *id.* at 4-5, climate trends in the Arctic and North Slope, and extensively discusses the effects of the project on climate change. The FSEIS presents BLM's predicted climate effects of each alternative, *id.* 11-12, and the "social cost of greenhouse gases" for each action alternative, first by calculating direct and indirect GHG emissions per alternative, *id.* at 15-17, and then translating this to social cost comparisons (in dollars) per alternative, *id.* at 17-23. BLM also identified lease stipulations and required operating procedures "intended to mitigate climate change impacts from development activity," including ambient air monitoring and restrictions to protect vegetation and tundra. *Id.* at 7-8. In providing cooperating agency feedback on a preliminary version of the FSEIS, the U.S. Environmental Protection Agency explained that the FSEIS contained "the most transparent analysis [it] has seen" regarding GHG emissions and their social cost. Gov-Ex. 9 at 5.

### D. Proceedings Below

#### 1. Preliminary Injunction Proceedings in March and April 2023

Plaintiffs filed their complaints in March 2023, and each moved for a temporary restraining order and preliminary injunction to enjoin ConocoPhillips's planned construction in March and April of 2023. ECF No. 23 (No. 3:23-cv-

00058-SLG); ECF No. 24 (No. 3:23-cv-00061-SLG). The district court expedited consideration of the motions, and denied them on April 3, 2023. *See* SILA-Ex. 21, ECF No. 10-22, at 44. The district court held that Plaintiffs failed to show they would be irreparably harmed by ConocoPhillips's activities planned for the remaining weeks of winter and that the balance of the equities and public interest both "tip[ped] sharply" against granting preliminary injunctive relief. *Id.* at 43.

Plaintiffs appealed, and this Court denied their motions for an injunction pending appeal. *See* SILA-Ex. 22, ECF No. 10-23. Plaintiffs subsequently dismissed their appeals.

### 2. Summary Judgment Order and Appeal

The parties proceeded to merits briefing and jointly requested a decision from the district court by November 10, 2023. *See* ECF No. 86 (Case No. 3:23-cv-00058-SLG).

On November 9, 2023, the district court issued a 109-page order rejecting all of Plaintiffs' claims in both cases. *See* SILA-Ex. 24, ECF No. 10-25. First, the district court held that BLM considered "the requisite reasonable range of alternatives based on the Project's purpose and need." *Id.* at 18. The court concluded that "BLM did not misapprehend its authority" under the NPRPA, noting that although Congress directed "maximum protection" be accorded to significant surface values in Special Areas, "it still clearly envisioned that the

TLSA would be developed for oil and gas production."[2] *Id.* at 19-20. And, as for Plaintiffs' assertion that BLM again considered only alternatives that would allow the lessee to extract "all possible oil," the district court held that the FSEIS "remedie[d] this deficiency" from the 2020 EIS. *Id.* at 24-25.

The district court next held that Plaintiffs' assertions about deficiencies in the FSEIS's GHG emissions analysis were "unfounded." *Id.* at 37. First, the district court explained that BLM "rectified" the 2020 EIS's failure to include foreign GHG emissions in its analysis. *Id.* at 35. Then, the court rejected Plaintiffs' claims that BLM violated NEPA by failing to consider GHG emissions from West or Greater Willow—a potential future development site where two exploration wells have been drilled. *Id.* at 37.

Finally, the district court held that BLM complied with the Alaska National Interest Lands Conservation Act and that FWS, BLM, and the National Marine Fisheries Service complied with the Endangered Species Act. *Id.* at 47-56, 80-109.

Plaintiffs filed their notices of appeal on November 14, 2023, and moved in the district court for an injunction pending appeal on November 15 and November 17, 2023. The district court denied the motions on December 1, 2023, concluding

---

[2] The district court noted that the BLM "may have elected to prohibit all infrastructure in the TLSA" at or before the leasing stage, but recognized that the sale of the leases held by ConocoPhillips meant that it could no longer do so. SILA-Ex. 24 at 21.

that Plaintiffs had failed to establish any of the *Winter* factors. SILA-Ex. 32, ECF No. 10-32. In particular, the district court held that Plaintiffs had "not shown that there is a serious question going to the merits of their claims" and that the public interest and balance of the equities "tip sharply against injunctive relief pending appeal," finding that "[t]he same interests persist at this stage of the litigation" as were present last winter. *Id.* at 6-8, 20, 27. Plaintiffs again seek an injunction pending appeal from this Court.

### E. Planned Construction Activities for 2023-2024

In April 2023, after the district court denied Plaintiffs' motion for a preliminary injunction, ConocoPhillips began limited winter construction at the Willow Project site, including opening a new gravel mine, building two miles of gravel road, and starting construction of a boat ramp on the Tiŋmiaqsiugvik River that will facilitate greater subsistence access. SILA-Ex. 30, ECF No. 10-31 ¶ 3. This seasonal work ceased on May 3, 2023. *Id.*

ConocoPhillips plans to resume surface-disturbing construction work on December 21, 2023, depending on weather conditions. *Id.* ¶ 7. In 2023-2024, onsite work will consist of: (1) construction of an additional eight miles of gravel road and two additional subsistence access ramps; (2) completion of the first subsistence boat ramp; (3) installation of pipelines and pipeline supports; (4) gravel mining at the existing Willow gravel mine site and opening a second gravel mine

site; (5) installation of gravel pads for the Willow Operations Center and the Willow Central Facility; (6) installation of the airstrip access road and airstrip apron; and (7) geotechnical work to support engineering design and construction. *Id.* ¶ 9. Non-surface disturbing work, including ice road construction, will also continue. *Id.* ¶ 8. ConocoPhillips estimates that up to 1,800 personnel will be employed in the field on the North Slope and an additional 600 contractors will support the Willow Project with engineering, planning, and other office work. *Id.* ¶ 11. Construction activities in the winter of 2024-2025 will also focus on infrastructure, with oil production still several years away. *Id.* ¶¶ 12-13.

## LEGAL STANDARD AND STANDARD OF REVIEW

Like preliminary injunctive relief, an injunction pending appeal is an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008), granted only "upon a clear showing that the plaintiff is entitled to such relief," *Winter*, 555 U.S. at 22. To obtain an injunction pending appeal, Plaintiffs must establish: (1) that they are "likely to succeed on the merits" of their appeal; (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief" pending appeal; (3) that "the balance of equities tips in [their] favor"; and (4) that "an injunction is in the public interest." *Id.* at 20; *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016) (en banc). This Court has stated that, alternatively, "'serious questions going to the merits' [rather than a likelihood of

success on the merits] and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).[3]

An injunction is "never awarded as of right," and Plaintiffs must make a "clear showing" that they have met all four requirements of the standard. *Winter*, 555 U.S. at 24. In weighing whether to grant Plaintiffs this "extraordinary remedy," *id.*, the likelihood of irreparable harm that the Court must consider is the likelihood that Plaintiffs will experience irreparable harm during the pendency of their appeals—as opposed to the likelihood of harm from the Project as a whole, *see Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020).

Ultimately, Plaintiffs' merits arguments will be reviewed pursuant to the deferential standard of the Administrative Procedure Act, under which agency action will be upheld unless "it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Westlands Water Dist. v. Dep't of the Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)). Review is most deferential where a court reviews scientific judgments and technical analyses within the agency's expertise. *Id.* at 871.

---

[3] Defendants do not concede the validity of *Cottrell*'s reasoning that the Ninth Circuit's historical "sliding scale" test for issuing a preliminary injunction survives *Winter*.

## ARGUMENT

Plaintiffs are not entitled to an injunction pending appeal.

As to the merits, the district court thoroughly examined each of Plaintiffs' claims and rejected them. Plaintiffs do not present any new arguments regarding their NEPA and NPRPA claims beyond what was already considered and rejected by the district court in its merits order.

As the district court concluded, when BLM supplemented the Willow Project 2020 EIS with the FSEIS, the agency directly responded to the errors identified by the court and approved only a scaled-back version of the project that permits fewer drill sites, and substantially less infrastructure in the TLSA, than ConocoPhillips had proposed. BLM's analysis complies with NEPA and the NPRPA.

As to harm and the public interest, the district court correctly concluded, after carefully considering the record, that: (1) Plaintiffs failed to show that they would be irreparably harmed by the 2023-24 construction activities, and (2) both the balance of the equities and the public interest "tip sharply" against granting injunctive relief pending appeal.

### I. Plaintiffs are not likely to succeed on, and have not even raised serious questions going to, the merits.

The district court thoroughly analyzed each of Plaintiffs' challenges to the Willow Project FSEIS, and rejected all of them. In their motions, Plaintiffs only

raise a subset of their claims, and they fail to show that they are likely to prevail on the merits, or even that there are serious questions going to the merits. As the district court found, this case "does not present an issue of first impression" or "competing analytical approaches." SILA-Ex. 32 at 8. Rather, as Plaintiffs conceded below, it "involves applying well-established Ninth Circuit law." *Id.* The district court applied that Circuit precedent and correctly entered judgment for Defendants.

### A. BLM's alternatives analysis satisfied NEPA.

Both sets of Plaintiffs assert that BLM failed to consider a reasonable range of alternatives pursuant to NEPA. *See* SILA Mot., ECF No. 10-1 (No. 23-3627), at 13-19; CBD Mot., ECF No. 10-1 (ECF No. 23-3624), at 4-9. Their arguments focus primarily on BLM's statutory authority under the NPRPA. As the district court concluded, however, BLM's revised alternatives analysis in the FSEIS satisfied NEPA and the NPRPA, and Plaintiffs have not raised serious questions about that ruling. Plaintiffs ignore BLM's thorough process of identifying, screening, and considering alternatives and the substantial revisions made in response to the 2021 Order. Plaintiffs believe that BLM should have adopted an alternative disapproving the Willow Project or prohibiting development in the TLSA. But neither NEPA nor the NPRPA required BLM to adopt one of those two alternatives.

NEPA's implementing regulations[4] direct an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a) (2019). An agency's choice of alternatives is governed by a "rule of reason," under which it "need not consider an infinite range of alternatives, only reasonable or feasible ones." *Westlands Water Dist.*, 376 F.3d at 868 (quotation omitted). NEPA does not require an agency to discuss "[a]lternatives that are unlikely to be implemented," *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1993), alternatives that are "inconsistent with the [agency's] basic policy objectives," *id.* (quotation omitted), or "alternatives similar to alternatives actually considered," *Kempthorne*, 457 F.3d at 978. The "touchstone for [a court's] inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 575 (9th Cir. 1998) (quotation omitted). And the range of alternatives that an agency must consider "is based on the purpose and need of the proposed agency action." *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 981 (9th Cir. 2022).

---

[4] The Council on Environmental Quality ("CEQ") amended its NEPA regulations in 2020 and again in 2022. 85 Fed. Reg. 43,304 (July 16, 2020); 87 Fed. Reg. 23,453 (May 20, 2022). Because BLM began this NEPA process before those amendments' effective dates, BLM applied the prior regulations. Gov-Ex.7 at 17. This Response solely cites the CEQ regulations as codified at 40 C.F.R. Parts 1500-08 (2019).

As set forth above, the NPRPA directs the Secretary of the Interior to undertake "an expeditious program of competitive leasing of oil and gas in the [NPR-A]." 42 U.S.C. § 6506a(a). The NPRPA also requires that certain oil and gas activities within designated special areas of the NPR-A provide "maximum protection" of surface values:

> Any exploration within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve.

*Id.* § 6504(a).[5] A separate section of the NPRPA applies more broadly throughout the NPR-A:

> Activities undertaken pursuant to this Act shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [NPR-A].

*Id.* § 6506a(b).

BLM stated that the purpose of the proposed action in the FSEIS is "to construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources in the Willow reservoir located in the Bear

---

[5] When Congress amended the NPRPA in 1980, it stated "that any exploration *or production* undertaken pursuant to this section shall be in accordance with section 6504(a) of this title." 42 U.S.C § 6506a(n)(2) (emphasis added).

Tooth Unit (BTU), while providing maximum protection to significant surface resources within the NPR-A, consistent with BLM's statutory directives." Gov-Ex. 2 at 2-3. BLM's statement aligns with the "two directives in the NPRPA," SILA-Ex. 24 at 13-14 (citing 42 U.S.C. §§ 6506a(a), 6506a(b), 6504(a)), and Plaintiffs concede that the statement is reasonable, *see id.* at 16; SILA Mot. at 18 (describing the statement as "reasonable on its face"). As the district court concluded, BLM considered "the requisite reasonable range of alternatives based on the Project's purpose and need." SILA-Ex. 24 at 18.

**1. BLM considered a broad range of alternatives in the FSEIS and complied with the district court's 2021 order on remand.**

To begin, BLM's new alternatives analysis in the FSEIS "remedie[d]" the only deficiencies identified in the 2021 summary judgment order. SILA-Ex. 24 at 24-25. In the 2021 Order, the district court held that BLM's 2020 EIS (1) "failed to consider the statutory directive that 'maximum protection' be given to surface values within the TLSA," and (2) improperly "developed its alternatives analysis based on the view that ConocoPhillips has the right to extract all possible oil and gas on its leases." *SILA*, 555 F. Supp. 3d at 770. The court rejected BLM's argument that ConocoPhillips's lease rights precluded the agency from considering alternative configurations or locations of drill pads, explaining that BLM's position was "inconsistent with its own statutory responsibility to mitigate adverse effects

on the surface resources." *Id.* at 768-69 (citing 42 U.S.C. § 6506a(b)). The court explained that "infrastructure is allowed, and indeed anticipated, within the TLSA." *Id.* But it concluded that BLM's explanation erroneously "presupposes the preclusion of any alternative development scenarios within the TLSA based on the lease terms." *Id.* The district court directed BLM to "reassess its alternatives analysis consistent with the terms of this order." *Id.* at 770.

As the district court explained in its 2023 summary judgment order, BLM followed the court's directive and "did not misapprehend its authority" in the 2023 FSEIS and ROD. SILA-Ex. 24 at 19.

The FSEIS contains 266 pages discussing how BLM developed alternatives. *See* Gov-Ex. 7 (Appendix D excerpts). BLM and cooperating agencies generated and considered an extensive list of "alternative components"—essentially, different project design features, configurations, and timelines. Among the numerous alternative components considered by BLM for the first time in the SEIS, alternative components number 36 and number 44 would, respectively, reroute the project's access road outside of the Colville River Special Area (leaving no facilities there), and prohibit all infrastructure in the TLSA. *Id.* at 52-53. BLM developed an entirely new Alternative (Alternative E) that reduced impacts over alternatives considered in the 2020 EIS and specifically eliminated an entire

drilling pad and its associated infrastructure from within the TLSA. Gov-Ex. 3 at 4-5.

BLM ultimately approved a modified version of Alternative E that further scales back the Project by authorizing only three drilling pads, specifically denying ConocoPhillips's request for a fourth and fifth pad. SILA-Ex. 1 at 18-22. Compared to ConocoPhillips's proposal (Alternative B in the FSEIS), Alternative E—as modified in the ROD—"significantly reduces the footprint of project infrastructure and the level of construction and operational activities, both within and outside of the sensitive TLSA, and thereby substantially reduces impacts to a broad range of surface resources." *Id.* at 21 (noting that reduced length of road and pipelines will also reduce adverse impacts to caribou). The slimmer project profile works in concert with broader required operating procedures adopted in the programmatic 2022 IAP ROD,[6] including specific measures to eliminate or reduce adverse effects within the TLSA. *See id.* at 13, 19-20; *see also* SILA-Ex. 1 at 47. The district court thus properly rejected Plaintiffs' argument that BLM "repeated" its earlier error. *See* SILA Mot. at 15; CBD Mot. at 6.

---

[6] Some of the same Plaintiff organizations challenged the 2020 IAP/EIS, and many of them supported the 2013 ROD and its reinstitution through the 2022 IAP ROD. *See* SILA-Ex. 20, ECF No. 10-21, ¶ 16 ("In response to our litigation, the Biden Administration decided to review the IAP and ultimately reinstated the protections provided under the 2013 IAP."). This realignment represents another significant difference between the present challenge to the 2023 Willow decisions and litigation challenging the 2020 Willow decisions.

### 2. BLM properly understood its statutory authority and ultimately approved an alternative that produces less oil than ConocoPhillips's proposal.

Attempting to brush aside BLM's significant new analysis, SILA Plaintiffs assert that "BLM unlawfully constrained its view of its legal authority" and "improperly limited its consideration of alternatives." SILA Mot. at 18 (suggesting that all action alternatives "presented only small variations on ConocoPhillips' proposed project"); CBD Mot. at 4-6 (asserting that BLM's "flawed" interpretation of the NPRPA led it to evaluate "an unlawfully narrow set of alternatives"). Similarly, Plaintiffs assert that the district court "overstate[d] the nature of ConocoPhillips' lease rights" in a way that "erroneously limits BLM's authority to adopt prohibitions or other mitigation measures to only those that will still provide for full-field development." SILA Mot. at 16-17; *see also* CBD Mot. at 7-8. These arguments ignore substantive revisions in the FSEIS and the district court's well-reasoned analysis of the Project's purpose and BLM's statutory directives.

As the district court noted, BLM explained that the FSEIS "does not assume that ConocoPhillips has the right to extract all possible oil and gas from its leases" and recognized that BLM "may condition Project approval to protect surface resources even if doing so reduces the amount of oil and gas that can be profitably produced." SILA-Ex. 24 at 24-25 (quoting Gov-Ex. 6 at 1). This is "certainly a

distinguishable difference from BLM's previous 'all possible oil' standard" in the 2020 EIS, *see id.* at 25, and it resulted in a much different alternatives analysis.

In the 2020 EIS, "[e]ach action alternative considered the same drill site locations and would produce the same amount of oil." *SILA*, 555 F. Supp. 3d at 768 n.156. The 2023 FSEIS, by contrast, meaningfully varied the action alternatives, including the number and total surface area of drill site gravel pads (ranging from 62.8 to 88.3 acres); infield pipelines (ranging from 30.2 to 47.0 miles); gravel roads (ranging from 27.2 to 37.4 miles); ice roads (ranging from 431.2 to 962.4 miles); and infrastructure in special areas (ranging in the TLSA from 61.2 acres/4.9 miles of pipeline to 179.6 acres/12.2 miles of pipeline). *See* Gov-Ex. 3 at 19-24 (Table 2.7.1).

BLM also considered alternatives that produce less oil and approved an alternative that "ultimately precluded development on some of ConocoPhillips' leases," as CBD Plaintiffs concede. *See* CBD Mot. at 8-9 (citing maps showing that at least three leases "would not recover any oil under modified Alternative E"). First, BLM thoroughly analyzed the no-action alternative, under which no oil would be produced. *See*, *e.g.*, Gov-Ex. 4 at 11. Then, BLM analyzed a new alternative in the FSEIS (Alt. E) estimated to result in production of 613.5 million barrels of oil, somewhat less than the 628.9 million barrels resulting from ConocoPhillips's proposal (Alt. B). *Id.* at 21-23. BLM ultimately approved an

alternative in the ROD (modified Alt. E) that is projected to result in the development of even less oil: 576 million barrels. *See* SILA-Ex. 1 at 22; *see also id.* at 20 (modified Alt. E is projected to include up to 199 wells, substantially fewer than the 251 wells anticipated under the other action alternatives). And modified Alternative E is also projected to have lower direct and indirect GHG emissions than the other action alternatives studied in detail. *See id.* at 21-22; Gov-Ex. 4 at 15-16. *Contra* SILA Mot. at 15. Plaintiffs are thus wrong that BLM "failed to consider an alternative" that would allow for less than full development of ConocoPhillips's leases. SILA Mot. at 1-2; *see* CBD Mot. at 5.

### 3. BLM's screening of alternatives satisfied NEPA.

In the FSEIS, BLM considered 27 brand new alternative components. Consistent with NEPA regulations, BLM reasonably explained why it ultimately included some components but declined to include others within the action alternatives analyzed in detail. *See generally* Gov-Ex. 7 at 43-65; 40 C.F.R. § 1502.14(a) (an agency must "briefly discuss" the reasons for eliminating alternatives from detailed study); SILA-Ex. 24 at 26-27.

Relevant here, BLM considered a new alternative component (No. 44) that would have prohibited all infrastructure in the TLSA by eliminating drill site BT4 and shifting drill site BT2 south to just outside the TLSA. Gov-Ex. 7 at 60. BLM declined to carry forward this alternative component for multiple reasons. BLM

explained that eliminating infrastructure in the TLSA would "completely eliminate access to oil and gas resources in several" Willow leases in the TLSA that could only be reached by a drill site located within the TLSA. *Id.* Eliminating infrastructure would also "substantially reduce access" to oil and gas resources in additional leases that could only be reached in part from a drill site location just outside of the TLSA. *Id.* And it would "create significant overlap in drilling reach between drill sites BT1 and BT2," as BT2 moved outside of the TLSA would be substantially closer to BT1. *Id.* An alternative with no infrastructure in TLSA is not reasonable or feasible due to the limits of available drilling technology and the fact that approximately 67 percent of ConocoPhillips's Willow Project "leases by surface area are located in the TLSA." *Id.* BLM reasoned that this alternative component would not meet the Project's purpose and need and thus eliminated it from detailed evaluation. *Id.*

The district court concluded that BLM's explanation for removing alternative component No. 44—and others—from further consideration satisfied NEPA's requirements. SILA-Ex. 24 at 26-27. As the district court explained in 2021 and reiterated in the 2023 Order, "infrastructure is allowed, and indeed anticipated, within the TLSA." *Id.* at 21-22 (quoting *SILA*, 555 F. Supp. 3d at 769). And "[t]he alternatives that BLM analyzed are fully consistent with an interpretation of the purpose and need statement that recognizes the rights and

responsibilities of the lessee." *Id.* at 20-21; *see also supra* n.1 (explaining non-NSO leases); *Kempthorne*, 457 F.3d at 978-79 ("BLM's explanation that [plaintiff's preferred alternative] as a whole was inconsistent with the . . . project and statutory mandates, coupled with its willingness to incorporate several recommendations into the Preferred Alternative, constituted a sufficient explanation for its refusal to adopt" plaintiff's entire proposal).

Still, consistent with BLM's statutory authority in the NPRPA, the 2023 FSEIS and ROD contain significant elements designed to avoid, reduce, or otherwise mitigate impacts in the TLSA. *See* SILA-Ex. 1 at 12, 19-20, 41-113 (identifying lease stipulations, required operating procedures, design features, and additional adopted mitigation measures); Gov-Ex. 8. For example, BLM will develop compensatory mitigation for impacts on the TLSA and its caribou herd, including protecting surface areas, ensuring a buffer along all shores of the lake, and moving infrastructure farther from calving areas. SILA-Ex. 1 at 76 (Measure 27). As the district court found, "the alternatives analysis undertaken in the Final SEIS strikes an appropriate balance between the NPRPA's two directives of conducting an expeditious oil and gas leasing program in the NPR-A while protecting significant surface resources."[7] SILA-Ex. 24 at 29.

---

[7] The district court's conclusion was not at odds with *Kempthorne*, as SILA Plaintiffs assert. *See* SILA Mot. at 16-17. In *Kempthorne*, this Court explained that with "non NSO leases" the "government can condition permits for drilling on

Plaintiffs concede that BLM considered alternatives—and ultimately approved one—that produce less oil and involve less surface infrastructure than ConocoPhillips proposed. CBD Mot at 8-9. But Plaintiffs appear to assert that BLM should have analyzed additional, unspecified variants somewhere between the no-action alternative and Alternative E. *Id.* This Court has rejected similar arguments in NEPA cases. *See, e.g.*, *Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1004-05 (9th Cir. 2013) (rejecting argument that BLM was required to consider additional "mid-range alternative[s]"); *Westlands Water Dist.*, 376 F.3d at 871-72 (concluding range of alternatives was reasonable and holding that "EIS was not required to consider more mid-range alternatives to comply with NEPA"). The district court correctly concluded that Plaintiffs failed to show that their suggested alternatives—including an alternative that eliminated infrastructure from the TLSA—were viable in light of the objectives of the NPRPA or were "necessary to foster an informed decision and public participation." SILA-Ex. 24 at 29-30.

---

implementation of environmentally protective measures," and it "assume[d]" the government "can deny a specific application altogether if a particularly sensitive area is sought to be developed and mitigation measures are not available." 457 F.3d at 976. But this Court emphasized that the government could not, "consistent with current statutory imperatives, forbid all oil and gas development" in an entire planning area within the NPR-A. *Id.* Consistent with that interpretation, here the FSEIS and ROD contain numerous required operating procedures, design features, and other mitigation measures designed to mitigate adverse impacts in the TLSA. *See* Gov-Ex. 8; SILA-Ex. 24 at 44. In contrast, under Plaintiffs' proposed alternative—prohibiting infrastructure in the TLSA—ConocoPhillips would be prohibited from extracting oil from a significant number of its leases. Gov-Ex. 7 at 60. That goes well beyond "condition[ing] permits."

In sum, BLM considered a reasonable range of alternatives and explained why Plaintiffs' preferred alternative was not workable. It thus satisfied NEPA's requirement that agencies take a "hard look" at the environmental consequences of a proposed federal action. Plaintiffs fail to show that they are likely to succeed on the merits of their NEPA alternatives claim.

**B. BLM's analysis of GHG emissions satisfied NEPA.**

The district court properly rejected Plaintiffs' argument that the FSEIS's analysis of GHG emissions from potential future development was inadequate. SILA-Ex. 24 at 42. SILA Plaintiffs do not make this argument in their motion, and CBD Plaintiffs fail to show that they are likely to succeed on it.

"NEPA requires agencies to evaluate the direct and indirect effects of the proposed action." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 737 (9th Cir. 2020). "Indirect effects" are those that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," and "may include growth inducing effects." 40 C.F.R. § 1508.8(b).

As an initial matter, the district court determined that BLM properly addressed foreign GHG emissions in its new alternatives analysis in the 2023 FSEIS and thus "rectified this deficiency" from the 2020 EIS. SILA-Ex. 24 at 34-36. Plaintiffs do not disagree. *See id.*

Instead, CBD Plaintiffs challenge the FSEIS's analysis of the downstream GHG emissions from Greater Willow, a potential "future development" west of the Willow Project. CBD Plaintiffs argue that BLM "ignore[d]" Greater Willow and "provided no analysis" of its potential downstream GHG emissions. CBD Mot. at 12. The district court rejected similar arguments in its 2021 Order, *see SILA*, 555 F. Supp. 3d at 781, and again concluded last month that these assertions were "unfounded" when applied to the FSEIS, which presents an even more thorough discussion of Greater Willow, SILA-Ex. 24 at 37. CBD Plaintiffs' argument to the contrary misconstrues the district court's analysis and the record. *Compare* CBD Mot. at 9 (suggesting that the district court did not address CBD Plaintiffs' claim at all), *with* SILA-Ex. 24 at 36-42 (district court specifically addressing CBD Plaintiffs' arguments about indirect effects).

Greater Willow is "an oil and gas discovery with two exploration wells" in "areas [that] represent the general potential for future activity, but there is no certainty as to whether, how, or when this discovery could be developed." Gov-Ex. 5 at 4. Still, as the district court noted, the FSEIS "appropriately analyzed the indirect and cumulative GHG emissions impacts of the Willow Project," including the impacts of Greater Willow. SILA-Ex. 24 at 42. Specifically, the FSEIS discloses the "[p]rojected cumulative GHG emissions from all of the cumulative sources" and "potential future development" resulting from BLM's leasing

program in the NPR-A. Gov-Ex. 5 at 6. The FSEIS explicitly includes Greater Willow in its modeling of cumulative impacts to air quality, *id.* at 8-9, and as CBD Plaintiffs concede, *see* CBD Mot. at 11-12, in its discussion of Willow's growth-inducing impacts, Gov-Ex. 5 at 2.

Moreover, the FSEIS "tiers to the 2012 and 2020 IAP/EISs,"[8] which estimate GHG emissions from various levels of future development scenarios in the NPR-A, including estimates for downstream GHG emissions from developments like Greater Willow. SILA-Ex. 24 at 38-39. The FSEIS uses the "higher end" of projected emissions from future NPR-A development, Gov-Ex. 5 at 6, thus capturing the full potential growth-inducing impacts from the Willow Project, *see* SILA-Ex. 24 at 39.

CBD Plaintiffs assert that the 2020 IAP's evaluation of "*cumulative* impacts…cannot substitute for [the] required analysis of induced indirect effects." CBD Mot. at 12-13. But the FSEIS *did* analyze "growth inducing impacts," including potential impacts from Greater Willow. *See* Gov-Ex. 5 at 2. Thus, consistent with this Court's precedent, the FSEIS "contains 'a reasonably thorough discussion of the significant aspects of the probable environmental consequences'

---

[8] "Tiering refers to the coverage of general matters in broader environmental impact statements . . . with subsequent narrower statements or environmental analyses (such as . . . site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 C.F.R. § 1508.28.

of Willow's growth-inducing impacts," including Greater Willow, and allows "for meaningful public participation and informed decision-making about the Willow Project." SILA-Ex. 24 at 41 (quoting *City of L.A. v. Fed. Aviation Admin.*, 63 F.4th 835, 849 (9th Cir. 2023)).[9]

### C. BLM did not violate the NPRPA.

Both Plaintiffs at times suggest that BLM violated the NPRPA, although it is not entirely clear whether this is an independent argument or part of their NEPA argument. *See* SILA Mot. at 14-19; CBD Mot. at 7-9. In any event, BLM properly applied the NPRPA's resource-protection requirements.

As set forth above and consistent with the NPRPA's directive, *see supra* p. 19, the FSEIS and ROD contain numerous required measures specifically designed to avoid or mitigate adverse impacts in the TLSA, *see supra* p. 27. Plaintiffs do not engage with these measures, instead repeating their argument that BLM was required to consider another mid-range alternative or an alternative that eliminates all infrastructure in the TLSA. *See* SILA Mot. at 13-15; CBD Mot. at 7-9. The

---

[9] CBD Plaintiffs also mischaracterize the district court's explanation for determining that the cases they rely on are "inapposite." *See* SILA-Ex. 24 at 41-42; CBD Mot. at 10 n.3. As the district court correctly explained, the cases cited by CBD all involved an agency's failure to prepare an EIS altogether and addressed whether potential growth-inducing impacts *could trigger* an EIS obligation. SILA-Ex. 24 at 42. Here, BLM prepared a thorough EIS and specifically considered the Willow Project's potential growth-inducing impacts.

district court properly "reject[ed] this argument for the same reasons that it . . . upheld BLM's alternatives analysis under NEPA." SILA-Ex. 24 at 42.

SILA Plaintiffs also contend that there is a "lack of case law" on "the scope of BLM's retained authority and obligations under the NPRPA following lease issuance," suggesting that this supports issuing an injunction.[10] SILA Mot. at 19. But this Court has repeatedly recognized BLM's discretion to impose mitigation measures pursuant to the NPRPA. *See N. Alaska Env't Ctr.*, 983 F.3d at 1081 ("The NPRPA directs BLM to lease [NPR-A] land to private entities for oil and gas development, while taking such measures as BLM deems necessary or appropriate to mitigate adverse environmental impacts." (citing 42 U.S.C. § 6506a)); *Kunaknana v. Clark*, 742 F.2d 1145, 1149 (9th Cir. 1984) ("[T]he Secretary was given the discretion to provide rules and regulations under which leasing would be conducted and was to develop restrictions necessary to mitigate adverse impact on the NPR-A." (emphasis deleted)). Such discretion is apparent from the statutory text, and courts decline to interpret similar provisions to

---

[10] SILA Plaintiffs claim certain provisions of the NPRPA and BLM regulations obligate BLM to "restrict and prohibit activities on existing leases, including by denying drilling permits," when "necessary to protect Special Areas." SILA Mot. at 16. But two of the provisions they cite—42 U.S.C. § 6506a(k)(2) and 43 C.F.R. § 3135.2(a)(1) and (3)—apply at the operational stage, where there are ongoing activities, not at the application for a permit to drill stage, as implicated here. And the third provision, 43 C.F.R. § 3162.3-1, applies at the application stage but pertains to deficiencies in the application, not to BLM's ability to restrict a lessee's lease rights.

"maximize" protection or "minimize" impacts as imposing some quantifiable threshold against which to judge agency action. *Cf. Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1235 (D. Or. 2013), *aff'd*, 638 F. App'x 648 (9th Cir. 2016) (finding BLM determination that a decision "is reasonably designed to minimize" impacts from vehicle use "is entitled to deference").

Plaintiffs point to no authority constraining BLM's discretion or defining how BLM must assure maximum protection to TLSA surface-resource values. Indeed, Plaintiffs acknowledged below that the NPRPA imbues BLM with "considerable discretion." SILA Opening Br., ECF No. 105 (3:23-cv-00058-SLG) at 18-19.

In sum, Plaintiffs have not raised serious questions on the merits of any of the claims they raise in their motions, much less shown they are likely to succeed.

## II. Plaintiffs have not demonstrated a likelihood of irreparable harm while these appeals are pending.

To obtain an injunction pending appeal, Plaintiffs must make a "clear showing" that they are "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter*, 555 U.S. at 22 (quotation omitted). A "possibility" of harm is insufficient, *id.*; Plaintiffs must "demonstrate immediate threatened injury," *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). This Court has repeatedly declined "to adopt a rule that any potential environmental injury automatically merits an injunction." *Earth Island*

*Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010) (quotation omitted); *see also Cottrell*, 632 F.3d at 1135 (stating it is not the case "that any potential environmental injury warrants an injunction" (quotation omitted)).

After a thorough review of the record in both cases, the district court concluded that Plaintiffs failed to establish that they will be irreparably harmed if ConocoPhillips proceeds with its planned construction activities while these appeals are pending. SILA-Ex. 32 at 8-19. In reaching that conclusion, the district court considered ConocoPhillips's construction activities last winter and its planned activities while these appeals are pending, noting that "ConocoPhillips will not produce any oil or gas at Willow during the 2023-2024 or 2024-2025 seasons" and that there would be no construction in the TLSA before January 2025. *Id.* at 11, 17; SILA-Ex. 31, ECF No. 10-32, ¶ 14. The court then carefully reviewed the declarations submitted by the parties.

First, the court considered potential subsistence impacts from ConocoPhillips's planned construction activities and concluded that Plaintiffs did not establish "immediate threatened injury." SILA-Ex. 32 at 12-15. As with last winter, *see* SILA-Ex. 21 at 23-24, the court found there were "competing narratives from subsistence hunters" about how the planned construction activities would affect caribou, SILA-Ex. 32 at 15. Although the court acknowledged declarations submitted by Plaintiffs raising concerns about impacts to subsistence

hunting, the court found that "winter is not a primary hunting time for caribou." *Id.* at 14. And the court considered numerous declarations submitted by Intervenors stating that the gravel road constructed last winter "has provided a boon to caribou harvesting." *Id.* at 14-15. The court concluded that this evidence, taken together, did "not support a finding that Plaintiffs have made the requisite clear showing that their subsistence hunting activities will be irreparably harmed if the 2023-2024 winter construction activities proceed."[11] *Id.* As for fishing, the court concluded that Plaintiffs failed to "causally connect[]" any injury to fish to ConocoPhillips's planned 2023-2024 construction activities, given BLM's determination that "fish would not be affected by blasting or gravel excavation." *Id.* at 12-13.

---

[11] CBD Plaintiffs submitted a "declaration" from three "decorated caribou experts" with their district court motion for an injunction pending appeal. *See* ECF No. 190-1 (No. 3:23-cv-00061-SLG). The district court did not consider it because it was unsworn, "there is no indication that it was made under penalty of perjury," and it was "not included in the administrative record" or shown to be publicly available. SILA-Ex. 32 at 13 n.51. After the court denied their motion for an injunction pending appeal, CBD Plaintiffs filed a motion for reconsideration, which included the same declaration but with signed statements by the authors. The district court denied this motion, noting that CBD Plaintiffs are represented by counsel and "the Court has already decided the merits of this case and the motion for an injunction pending appeal, based on the extensive administrative record and multiple sworn declarations that were filed, including those of CBD Plaintiffs' members." *See* ECF No. 216 (No. 3:23-cv-00061-SLG). The district court's decision not to consider this exhibit was within its discretion, and this Court should likewise disregard it. This eleventh-hour "study" does not provide evidence of harm to be suffered by a declarant. The proper function of a study in this context would be as part of the administrative record to be considered by the agency before making the challenged decision, not as "evidence" to advance the position of a litigant.

The district court also found that "Plaintiffs have not established that noise from blasting constitutes an irreparable injury that warrants an injunction pending appeal," crediting ConocoPhillips's "evidence that, on the whole, noise and vibrations from gravel mining last winter season was imperceptible or nearly imperceptible to Nuiqsut's residents." *Id.* at 16-17 (also noting that one of Plaintiffs' declarants lives in Fairbanks, not in the area around the Willow Project).

Finally, the district court concluded that Plaintiffs had failed to show that their members will suffer irreparable injury to their use and enjoyment of the land due to the 2023-2024 construction activities. *Id.* at 17-19 (reviewing declarations from Daniel Ritzman, Josh Oboler, and Dr. Rosemary Ahtuangaruak). The court noted that "no construction in the TLSA is planned before January 2025" and that the specific area one declarant planned to visit was 24.9 miles from the nearest Willow Project construction area. *Id.* (reviewing declarations of Daniel Ritzman, who stated he intended to visit the TLSA in the future and had other "unspecified plans" to explore the Ublutuoch River, and Josh Oboler, who has a trip planned to the Pik Sand Dunes and Teshekpuk Lake next summer). The decision below shows that the district court grappled with and closely analyzed the factual record.

Plaintiffs ignore the district court's factual findings, *see* CBD Mot. at 14-21, or simply disagree with them without good explanation, *see, e.g.*, SILA Mot. at 10. CBD Plaintiffs also contend that ConocoPhillips's planned construction activities

"threaten to set in motion a bureaucratic steam roller" that could inhibit future analysis if this Court remands. CBD Mot. at 21-22 (quotation omitted). CBD Plaintiffs did not assert this harm before the district court, which rejected a similar argument last April. *See* SILA-Ex. 21 at 30. In any event, if any legal error were to be identified and BLM's decision vacated—which BLM has shown is unlikely—ConocoPhillips's construction activities during the pendency of these appeals will have no impact on a future decision by BLM.

In sum, Plaintiffs fail to make the necessary "clear showing" that they are "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter*, 555 U.S. at 22.

## III. The district court's conclusion that the balance of equities and the public interest tip sharply against an injunction was not an abuse of discretion.

Plaintiffs must further establish that an injunction pending appeal would serve the public interest and that the balance of equities is in their favor; when the government is the opposing party, these factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

The district court, which is closely familiar with the area, issues, and voluminous record in this case, carefully considered dozens of declarations submitted by Plaintiffs and Intervenors and reasonably "conclude[d] that the

balance of the equities and the public interest tip sharply against injunctive relief pending appeal." SILA-Ex. 32 at 27.

Contrary to Plaintiffs' assertion, *see* SILA Mot. at 21; CBD Mot. at 22-23, the district court properly considered the equities and the public interest during the pendency of these appeals. The court "balance[d] the environmental and subsistence harms that have been asserted if the 2023-2024 winter construction activities proceed against the economic and other harms that would occur *if those activities are enjoined while the merits of this case are on appeal*." SILA-Ex. 32 at 20 (emphasis added)).

Specifically, the court acknowledged declarations submitted by Intervenors Kuukpik Corporation, Arctic Slope Regional Corporation, and the North Slope Borough regarding the economic and employment benefits to the region from the 2023-2024 construction activities. *Id.* at 21. In response to Plaintiffs' assertion that such economic benefits would "simply be deferred" if ConocoPhillips is permitted to resume construction after resolution of Plaintiffs' appeals, *id.* at 20; *see also* CBD Mot. at 23, the court noted that "39 percent of Nuiqsut households live below the poverty line" and that this season's construction will create hundreds of jobs, SILA-Ex. 32 at 21-22. Moreover, the court recognized that "last year's gravel road has already aided in the successful harvesting of caribou by many subsistence hunters," and the construction of additional miles of gravel road and the

subsistence ramps will yield further benefits. *Id.* at 26. And while the court acknowledged that the impact of the upcoming construction activities "is of legitimate concern to Plaintiffs," it also explained that "only a small area of the [NPR-A] will be impacted" and "[n]o construction will occur in the TLSA during the 2023-2024 winter construction season." *Id.* at 23-24 (explaining that "7.6 acres of the Colville River Special Area will be disturbed during construction (0.00031 percent of that special area); and 204.1 acres of land will be disturbed in the [NPR-A] (0.000879 percent of the [NPR-A])").

Recognizing that the "public interest inquiry . . . primarily addresses impact on non-parties," the court also considered "the strong legislative support at both the state and federal levels to proceed with the 2023-2024 winter construction activities." SILA-Ex. 32 at 24-26 (quoting *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 946 (9th Cir. 2013)). Specifically, the court noted the Alaska House and Senate's unanimous adoption of a resolution in February 2023 stating that further delay in the Willow Project "is not in the public interest"; the unanimous support for the Project from Alaska's elected representatives; and an amicus brief filed by the Alaska Congressional Delegation and State Legislature asserting that granting an injunction would cause immediate harm to Alaska's economy. *Id.* (citing *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009)); *see also Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943)).

SILA Plaintiffs contend that the court's reliance on this legislative support was misplaced. *See* SILA Mot. at 24. But it was reasonable for the district court to consider this evidence when weighing how an injunction pending appeal "would implicate issues of broader public concern" and would "reach[] beyond the parties, carrying with it a potential for public consequences." SILA-Ex. 32 at 24 (quoting *Inst. of Cetacean Research*, 725 F.3d at 946).

Moreover, the district court correctly reasoned that allowing the 2023-2024 construction activities to proceed would be "consistent with the congressional directive in the NPRPA" that the Secretary conduct "an expeditious program of competitive leasing of oil and gas in the [NPR-A]." *Id.* at 26. *Contra* CBD Mot. at 24.

The district court did not abuse its discretion in finding that both "the balance of the equities and the public interest tip sharply against injunctive relief pending appeal." SILA-Ex. 32 at 27. Plaintiffs have not made a "clear showing" otherwise. *Winter*, 555 U.S. at 22.

## CONCLUSION

The motions for an injunction pending appeal should be denied.

Respectfully submitted,

/s/ *Amy E. Collier*

TODD KIM
*Assistant Attorney General*

ROBERT J. LUNDMAN
THEKLA HANSEN-YOUNG
PAUL A. TURCKE
AMY E. COLLIER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 616-2625
amy.collier@usdoj.gov

Of Counsel:

MIKE GIERYIC
MIKE ROUTHIER
*Attorneys*
Office of the Solicitor
U.S. Department of the Interior

December 11, 2023

DJ# 90-1-4-17039, 90-1-4-17040

## CERTIFICATE OF COMPLIANCE

1. This response complies with the type-volume limit sought in Federal Appellees' motion for additional words, filed along with this response, because it contains 9,715 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Amy E. Collier*

AMY E. COLLIER

Counsel for Federal Appellees