Consolidated Case Nos. 23-3624 & No. 23-3627

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, et al.,
Plaintiffs-Appellants,

v.

BUREAU OF LAND MANAGEMENT, et al.,
Defendants-Appellees,

and

CONOCOPHILLIPS ALASKA, INC., et al.,
Intervenor-Defendants-Appellees.

On Appeal from the United States District Court
for the District of Alaska
Case No: 3:23-cv-00058-SLG

# APPELLANTS' OPENING BRIEF

Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA
121 W. Fireweed Lane, Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org
bbrisson@trustees.org

*Counsel for Plaintiffs-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants Sovereign Iñupiat for a Living Arctic, Alaska Wilderness League, Environment America, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society state that they have no parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States and that no publicly held corporation owns 10% or more of their stocks because they have never issued any stock or other security.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....... i

TABLE OF CONTENTS ....... ii

TABLE OF AUTHORITIES ....... iv

INTRODUCTION ....... 1

JURISDICTIONAL STATEMENT ....... 3

STATUTORY AND REGULATORY AUTHORITIES ....... 4

ISSUES PRESENTED ....... 4

STATEMENT OF THE CASE ....... 5

I. Factual and Procedural Background ....... 5

A. The Reserve's Exceptional Wildlife, Wilderness, and Cultural Values ....... 5

B. BLM's Authorizations of Willow ....... 8

C. The Current Litigation ....... 12

II. Legal Background ....... 13

A. Naval Petroleum Reserves Production Act ....... 13

B. National Environmental Policy Act ....... 15

C. Alaska National Interest Lands Conservation Act ....... 17

SUMMARY OF THE ARGUMENT ....... 19

STANDARD OF REVIEW ....... 20

ARGUMENT ....... 21

I. BLM Violated the Reserves Act and NEPA by Unlawfully Limiting Its Authority and Failing to Consider a Reasonable Range of Alternatives. ....................21

A. BLM's Misinterpretation of the Reserves Act Caused the Agency to Eliminate More Protective Alternatives from Detailed Consideration. ....................22

B. BLM's Approach Violated the Reserves Act's Plain Language. ....................25

C. BLM's Purpose and Need Statement Did Not Preclude the Full Analysis of More Protective Alternatives. ....................28

D. BLM's Consideration and Adoption of Alternative E Does Not Redeem Its Unlawful Interpretation and Flawed Analysis. ......30

II. BLM Violated ANILCA Section 810's Substantive Mandates by Failing to Consider More Protective Alternatives and Take Reasonable Steps to Reduce Impacts to Subsistence Uses. ................33

III. The Court Should Vacate BLM's Decisions. ....................43

CONCLUSION ....................46

CERTIFICATE OF COMPLIANCE ....................48

CERTIFICATE OF SERVICE ....................48

STATEMENT OF RELATED CASE ....................49

# TABLE OF AUTHORITIES

## Statutes

5 U.S.C. § 702 .......... 21

5 U.S.C. § 704 .......... 21

5 U.S.C. § 706 .......... 21, 43

16 U.S.C. § 3101 .......... 17, 23, 34, 46

16 U.S.C. § 3111 .......... passim

16 U.S.C. § 3112 .......... passim

16 U.S.C. § 3113 .......... 17

16 U.S.C. § 3120 .......... passim

28 U.S.C. § 1291 .......... 3

28 U.S.C. § 1331 .......... 3, 11

42 U.S.C. § 4332 .......... 15, 32

42 U.S.C. § 6502 .......... 13

42 U.S.C. § 6503 .......... 14

42 U.S.C. § 6504 .......... passim

42 U.S.C. § 6506a .......... passim

## Regulations

40 C.F.R. § 1500.1 .......... 15

40 C.F.R. § 1500.2 .......... 16

40 C.F.R. § 1502.1 .......... 15

40 C.F.R. § 1502.14 .......... 15, 45

43 C.F.R. § 3135.2 .......... 14, 25

43 C.F.R. § 3137.71 .......... 23

43 C.F.R. § 3162.3-1 .......... 14

**Cases**

*350 Mont. v. Haaland*,
50 F.4th 1254 (9th Cir. 2022) .................................................................. 43

*Alaska Survival v. Surface Transp. Bd.*,
705 F.3d 1073 (9th Cir. 2013) .................................................................. 30

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
67 F.3d 723 (9th Cir. 1995)........................................................... 16, 34, 39

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018) .................................................................. 44

*Amoco Prod. Co. v. Vill. Of Gambell, AK*,
480 U.S. 531 (1987) ................................................................................ 35

*Angoon v. Marsh*,
749 F.2d 1413 (9th Cir. 1984) .................................................................. 34

*Bottinelli v. Salazar*,
929 F.3d 1196 (9th Cir. 2019) ............................................................ 21, 28

*California v. Block*,
690 F.2d 753 (9th Cir. 1982) .................................................................... 33

*California Cmtys. Against Toxics v. U.S. EPA*,
688 F.3d 989 (9th Cir. 2012) .................................................................... 44

*Ctr. for Food Safety v. Regan*,
56 F.4th 648 (9th Cir. 2022) ..................................................................... 44

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ............................................................................. 43

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) .................................................................. 46

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) .................................................................. 16

*Hanlon v. Barton*,
740 F. Supp. 1446 (D. Alaska 1988) ........................................................ 18

*Humane Soc'y of the U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) .................................................................. 43

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) .................................................................... 44

*'Ilio'ulaokalani Coal. v. Rumsfeld*,
464 F.3d 1083 (9th Cir. 2006) .................................................................. 29

*Kootenai Tribe of Idaho v. Veneman*,
313 F.3d 1094 (9th Cir. 2002) .................................................................. 16

*Kunaknana v. Clark*,
742 F.2d 1145 (9th Cir. 1984) ........................................................... 39, 40

*Morongo Band of Mission Indians v. Fed. Aviation Admin.*,
161 F.3d 569 (9th Cir. 1998) .................................................................... 16

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................... 21

*Nat'l Family Farm Coal. v. EPA*,
960 F.3d 1120 (9th Cir. 2020) ........................................................... 43, 45

*N. Alaska Envtl. Ctr. v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006) .................................................................... 27

*NRDC v. U.S. EPA*,
38 F.4th 34 (9th Cir. 2022) ........................................................... 43, 44, 45

*NRDC v. U.S. Forest Serv.*,
421 F.3d 797 (9th Cir. 2005) .................................................................... 32

*Pit River Tribe v. U.S. Forest Serv.*,
469 F.3d 768 (9th Cir. 2006) .................................................................... 20

*Pollinator Stewardship Council v. U.S. EPA*,
806 F.3d 520 (9th Cir. 2015) ........................................................ 43, 44, 45

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
177 F.3d 800 (9th Cir. 1999) .................................................................... 31

*Resources Ltd. v. Robertson.*,
35 F. 3d 1300 (9th Cir. 1994) ................................................................... 17

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .......................................................................... 45

*Se. Alaska Conservation Council v. U.S. Forest Serv.*,
443 F. Supp. 3d 995 (D. Alaska 2020) ..................................................... 34

*Sierra Club v. Penfold*,
664 F. Supp. 1299 (D. Alaska 1987) ........................................................ 18

*Sierra Club v. Trump*,
929 F.3d 670 (9th Cir. 2019) .................................................................. 46

*Slaven v. BP America*,
973 F.2d 1468 (9th Cir. 1992) ................................................................ 36

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
555 F. Supp. 3d 739 (D. Alaska 2021) ............................................... passim

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
282 F. Supp. 3d 91 (D.D.C. 2017) .......................................................... 45

*Students for Fair Admissions, Inc. v. Harvard*,
143 S. Ct. 2141 (2023) ............................................................................. 4

*Tenakee Springs v. Clough*,
750 F. Supp. 1406 (D. Alaska 1990) ........................................................ 34

*Tenakee Springs v. Clough*,
915 F.2d 1308 (9th Cir. 1990) .......................................................... passim

*The Wilderness Soc'y v. U.S. Forest Serv.*,
630 F.3d 1173 (9th Cir. 2011) (en banc) .................................................. 16

*W. Watersheds Project v. Bernhardt*,
543 F. Supp. 3d 958 (D. Idaho 2021) ........................................... 30, 42, 43

*W. Watersheds Project v. Abbey*,
719 F.3d 1035 (9th Cir. 2013) ................................................................ 25

*Westlands Water Dist. v. U.S. Dep't of the Interior*,
376 F.3d 853 (9th Cir. 2004) .................................................................. 45

*Wood v. Burwell*,
837 F.3d 969 (9th Cir. 2016) .................................................................. 43

**Other Authorities**

National Petroleum Reserve in Alaska Designation of Special Areas, 42 Fed. Reg. 28,723 (June 3, 1977) .......................................................................................... 7

Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,027 (Mar. 23, 1981) .................................. 16

FED. R. APP. P. 4 ........................................................................................... 3

## INTRODUCTION

This appeal concerns the U.S. Bureau of Land Management's (BLM) unlawful approval of the Willow Master Development Plan (Willow), which will cause significant harm to the wildlife and ecosystems of the National Petroleum Reserve–Alaska (Reserve) and the people that rely on them. The Reserve is one of the wildest expanses of public lands in the United States. Located in the western Arctic, it is home to caribou, migratory birds, and threatened polar bears. The Indigenous people who live in the region rely on its lands, waters, and subsistence resources, and have for millennia.

Since the construction of the Trans-Alaska Pipeline in the 1970s, the oil industry has expanded oil and gas development across Arctic Alaska. Over the past several decades, the majority of this development occurred in the vicinity of the pipeline on State of Alaska lands in the central Arctic. In recent years, however, the oil industry has begun to sprawl westward to explore and extract oil on federal lands in the Reserve. Willow, proposed by ConocoPhillips Alaska, Inc. (ConocoPhillips), would be an extensive new oil and gas complex in the Reserve. It would be located farther west than any other major oil infrastructure, in an undeveloped area between and adjacent to the community of Nuiqsut and Teshekpuk Lake, the largest lake in Arctic Alaska. Although BLM administers an oil and gas program in the Reserve, it is required under federal law to minimize

impacts to subsistence use and protect the Reserve's wildlife and surface values, including by providing maximum protection for designated Special Areas.

ConocoPhillips originally proposed Willow in 2018, and BLM first approved the project in 2020. In August 2021, the U.S. District Court vacated BLM's approvals due to critical flaws in the analyses, including the alternatives analysis under the National Environmental Policy Act (NEPA). *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.* (*SILA*), 555 F. Supp. 3d 739, 804–05 (D. Alaska 2021). BLM prepared a supplemental environmental impact statement (SEIS) and released a new Record of Decision in March 2023. The SEIS again failed to consider a reasonable range of alternatives consistent with the agency's obligations under NEPA and its mandate to protect surface resources under the Naval Petroleum Reserves Production Act of 1976 (Reserves Act). Similar to its previous unlawful approval, BLM constrained its NEPA review by assuming that ConocoPhillips had the right to extract all economically recoverable oil beneath its leases. Based on this faulty assumption, the agency declined to fully consider other alternatives that would provide for less than full-field development and better protect the Reserve's resources. Because of its erroneous assumption, BLM also failed to properly consider alternatives or take sufficient steps to reduce impacts to subsistence users as required by Section 810 of the Alaska National Interest Lands Conservation Act (ANILCA).

Plaintiffs-Appellants Sovereign Iñupiat for a Living Arctic and partner groups (collectively, SILA) challenged these approvals in District Court. The District Court rejected SILA's challenges, concluding that BLM had not violated applicable law. The District Court erred in numerous respects. SILA respectfully requests that this Court reverse the District Court's order and judgment and vacate BLM's unlawful approvals of Willow.

## JURISDICTIONAL STATEMENT

Jurisdiction was proper in the District Court under 28 U.S.C. § 1331 because SILA's claims arose under federal law and were asserted against the federal government. Complaint for Declaratory and Injunctive Relief, District Court Dkt. 1 at 57–60. This Court has jurisdiction under 28 U.S.C. § 1291 because SILA appeals a final decision of the District Court. 1-ER-3–4. This appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B) because judgment was entered on November 9, 2023, *id*., and SILA filed its notice of appeal on November 14, 2023. 2-ER-278–282.

SILA has standing to challenge BLM's violation of federal laws in approving Willow because its members use of the Reserve is harmed by BLM's approvals and will be redressed by a favorable decision from this Court. *See, e.g.*, Dkt. 10.12–10.21 (declarations in support of injunction pending appeal describing organizations' missions and membership, and members use of the Reserve and

impact of Willow); District Ct. Dkt. 105-1–105-9 (standing declarations); *Students for Fair Admissions, Inc. v. Harvard*, 143 S. Ct. 2141, 2157 (2023) (organizational standing test).

## STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory and regulatory authorities appear in the Addendum to this brief.

## ISSUES PRESENTED

Whether BLM violated the Reserves Act's mandate to minimize impacts to surface resources and ensure maximum protection for Special Areas based on its erroneous interpretation that the statute required the agency to authorize full-field development of ConocoPhillips' oil and gas leases.

Whether BLM violated NEPA's mandate to consider a reasonable range of alternatives by limiting its consideration of alternatives to only those that would allow for full-field development of ConocoPhillips' oil and gas leases based on its erroneous interpretation of the Reserves Act.

Whether BLM violated ANILCA Section 810's mandate to minimize impacts to subsistence use by limiting its consideration of alternatives and mitigation measures to only those that would allow for full-field development of ConocoPhillips' oil and gas leases based on its misinterpretation of the Reserves Act.

# STATEMENT OF THE CASE

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Reserve's Exceptional Wildlife, Wilderness, and Cultural Values

Stretching across the Western Arctic, the Reserve is part of the Arctic Coastal Plain. The area is largely a mosaic of wetlands, dominated by tundra grasses and shrub willows. 2-ER-187. It is characterized by numerous lakes and streams, hundreds of ponds, and wide rivers, with continuous permafrost underlying the region. 2-ER-188–90. Aside from oil and gas, subsistence hunting and fishing are the predominant human activities in the area and have been for millennia. 2-ER-186–88. The majority of the Reserve, including lands located in the vicinity of Willow, have wilderness characteristics of solitude and are undisturbed by industrial development. 2-ER-204–05.

The Reserve provides rich habitat for wildlife, including species listed as threatened under the Endangered Species Act. Fish migrate widely throughout the Reserve's network of lakes, ponds, streams, and adjacent wetlands. 2-ER-192. Roughly 80 to 90 species of birds can be found in and around the Willow project area, including raptors, shorebirds, perching and songbirds, and waterfowl, as well as spectacled and Steller's eiders, which are listed as threatened under the Endangered Species Act. 2-ER-193. The Reserve also provides critical habitat for polar bears, which are also listed as threatened under the Endangered Species Act.

*See* 2-ER-197; 2-ER-150 (map). The Southern Beaufort Sea population of polar bears, which uses the area in the vicinity of Willow, is rapidly declining due to climate change and loss of sea ice habitat. 2-ER-149. The Reserve is also home to the Central Arctic and Teshekpuk Caribou Herds, which use the area for foraging, calving, and avoiding insects via the Arctic Coastal Plain's reliable breezes. 2-ER-195. Willow would be located within the area that the Teshekpuk Caribou Herd use for their spring migration, before giving birth to their calves southeast of Teshekpuk Lake. *Id*.

Subsistence is a critical foundation of life for communities in the region. As recently as 2019 (the most recent year that data was provided in the SEIS), at least 94% of Iñupiat households in North Slope communities reported using subsistence foods. 2-ER-198. Subsistence, however, is broader than simply food gathering. Communities on the North Slope also rely on subsistence harvests of plants and animals for their cultural, economic, and social well-being. *Id*. The sharing and distribution of subsistence foods, teaching traditional skills to future generations, and passing on social values though subsistence harvesting are key aspects of Iñupiat cultural identity. *Id.*; *see also* Decl. of Sam Kunaknana, Dkt. 10.19 ¶¶ 7–8, 15, 21–22, 25 (describing how his family has passed down their knowledge of subsistence hunting practices between generations and his personal subsistence hunting and sharing activities in Nuiqsut).

The Reserve's wildlife, particularly its caribou herds, are key subsistence resources. 2-ER-199 ("Caribou is a resource of specific interest in the EIS because of its importance to the community [] and the potential impacts of the Project on migration."). The Ublutuoch River and Fish Creek, two significant coastal rivers near Willow, are important for subsistence use. 2-ER-202–03. Nuiqsut subsistence users harvest resources such as bowhead whale, caribou, waterfowl, and fish. 2-ER-199–200. As the community located closest to oil and gas activities, Nuiqsut has already experienced impacts and disruptions to its subsistence activities. One-quarter to half of Nuiqsut harvesters recently reported that they avoid carrying out subsistence activities in areas near oil and gas infrastructure, which is increasingly encroaching on and surrounding the community. 2-ER-200.

In its management of the Reserve, BLM is required to provide maximum protection for the Reserve's Special Areas — including the Teshekpuk Lake and Colville River Special Areas — which were designated because of their abundant wildlife and ecological importance. National Petroleum Reserve in Alaska Designation of Special Areas, 42 Fed. Reg. 28,723 (June 3, 1977); *see* 42 U.S.C. § 6504(a). The Teshekpuk Lake Special Area provides habitat "critical to caribou calving and insect relief" for the Teshekpuk Caribou Herd. 2-ER-196. Teshekpuk Lake and its surrounding areas are also "globally significant for their use by large proportions of bird populations," and support a number of migratory bird species.

2-ER-194. All alternatives that BLM considered in the SEIS would allow infrastructure and activities in both of these Special Areas. 2-ER-175.

### B. BLM's Authorizations of Willow

Until recent years, oil and gas development was east of the Colville River, primarily on State of Alaska lands and in proximity to the Trans-Alaska Pipeline, including ConocoPhillips' existing oil fields. 2-ER-185. The Greater Mooses Tooth development projects, which were constructed beginning in 2017, were the first oil and gas development sites to be approved on federal lands in the Reserve. *Id.*; 2-ER-200.

Willow would extend ConocoPhillips' oil infrastructure much further west, effectively surrounding the community of Nuiqsut. As proposed, Willow would include extensive industrial development, including a spiderweb of gravel roads connecting Willow to ConocoPhillips' Alpine field, a central processing facility, an operations center, up to five drill sites, an airstrip, more than 300 miles of pipelines, an ice bridge over the Colville River to transport project infrastructure, and bridges over important subsistence waterways. 2-ER-177–82, 2-ER-191. It also includes two gravel mines adjacent to the Ublutuoch River. 2-ER-171.

BLM first approved Willow in October 2020. *SILA*, 555 F. Supp. 3d at 753. In August 2021, the District Court vacated BLM's and the U.S. Fish and Wildlife Service's project approvals due to serious deficiencies in the agencies' analyses

under NEPA and the Endangered Species Act. *Id.* at 804–05. Relevant here, the District Court held BLM acted unlawfully by failing to consider the Reserves Act's directive that BLM provide "maximum protection" for surface values within the Teshekpuk Lake Special Area, and by limiting alternatives based on the erroneous assumption that ConocoPhillips had the right to extract all oil and gas from its leases. *Id*. at 770.

Shortly thereafter, BLM began preparing an SEIS and released the draft SEIS in July 2022. The draft SEIS set out that the purpose and need for the project is to construct infrastructure on ConocoPhillips' leases to allow for the production and transportation of oil and gas, and to ensure that BLM's authorizations comply with the agency's legal mandates. 2-ER-255–56. The draft SEIS evaluated only one new alternative beyond its prior analysis: Alternative E. 2-ER-253. Alternative E included four drill sites instead of five; it eliminated one drill site within the Teshekpuk Lake Special Area and deferred approval of another drill site. 2-ER-254. Alternative E otherwise largely included the same infrastructure, mitigation, and design features as ConocoPhillips' original 2018 proposal. *Id.*; 2-ER-206 (map).

The draft SEIS contained numerous statements espousing BLM's view that it lacked authority to authorize less than full-field development. In describing the no action alternative, the agency stated, "BLM does not have the authority to select

this alternative because [ConocoPhillips'] leases are valid and provide the right to develop the oil and gas resources therein." 2-ER-259. BLM stated that it could not delay permitting Willow because "BLM is required by the [Reserves Act] to administer an 'expeditious' program of oil and gas leasing" and may not deny development. 2-ER-258. In describing how it screened alternatives for the SEIS, BLM stated that the alternatives needed to meet the purpose and need of the project, as well as be feasible and practical. 2-ER-257.

In comments on the draft SEIS, SILA questioned BLM's failure to consider a reasonable range of alternatives and its failure to address the legal issues identified by the District Court. 2-ER-221–229. SILA suggested additional alternatives consistent with the project purpose that could also provide better protections, such as eliminating infrastructure in Special Areas and other protections to keep development away from important areas (i.e., setbacks), eliminating additional drill sites, or further limiting Willow's greenhouse gas emissions. 2-ER-229–35. SILA also questioned the agency's failure to take a hard look at Willow's impacts to a range of resources, including subsistence and climate, and to consider measures to mitigate adverse effects to the Reserve's subsistence values, among others. 2-ER-236–51.

Instead of addressing those flaws, BLM's final SEIS contained the same shortcomings as its draft. All the action alternatives required waivers of previously

established river setbacks intended to protect subsistence. 2-ER-182, 2-ER-201. Every alternative would place at least one drill site, pipelines, and other infrastructure in the Teshekpuk Lake and Colville River Special Areas. 2-ER-175. In response to comments, BLM explained that it did not evaluate alternatives that would further limit ConocoPhillips' activities and infrastructure — and, in turn, Willow's impacts on Special Areas and surface resources — because it had determined it could not strand any economically viable quantity of recoverable oil. 2-ER-152, 2-ER-207–09, 2-ER-212. Based on the same reasoning, BLM also failed to consider and analyze additional protections for subsistence resources and uses, despite recognizing that there would be significant impacts to subsistence, and did not meaningfully limit greenhouse gas emissions and climate impacts. 2-ER-207–09, 2-ER-211–12.

BLM finalized its Record of Decision in March 2023, adopting Alternative E with additional modifications. 2-ER-127. In its decision, BLM approved three drill sites as discussed in the final SEIS but stated it was disapproving rather than deferring the fourth drill site. 2-ER-127–28.[1]

---

[1] BLM's unlawful approvals of Willow in 2020 likewise authorized only three drill sites, not the five drill sites ConocoPhillips originally proposed. 2-ER-117.

### C. The Current Litigation

SILA immediately challenged BLM's approvals of Willow under the Reserves Act, NEPA, ANILCA, the Administrative Procedure Act, and other laws. *See* 1-ER-6–7. ConocoPhillips, the North Slope Borough, the State of Alaska, Kuukpik Corporation, and the Arctic Slope Regional Corporation intervened as defendants. *Id*. SILA moved for summary judgment, alleging that BLM again approved Willow without considering a reasonable range of alternatives consistent with the agency's obligations under NEPA, its mandate to protect surface resources under the Reserves Act, and its obligation to reduce impacts to subsistence users as required by ANILCA Section 810.[2] Federal Defendants and Intervenor-Defendants (collectively, Defendants) opposed and filed cross-motions for summary judgment. The District Court denied SILA's motion for summary judgment, dismissed SILA's claims, and entered its final judgment for Defendants on November 9, 2023. 1-ER-109; 1-ER-3–4.

ConocoPhillips plans to build a significant portion of Willow's permanent gravel infrastructure during this winter construction season, including 7–8 miles of

---

[2] SILA further argued that BLM failed to adequately assess all the effects of Willow's significant greenhouse gas emissions as required by NEPA. SILA also challenged the U.S. Fish and Wildlife Service's biological opinion for failing to comply with the Endangered Species Act. 1-ER-7. SILA is appealing only a subset of its claims.

roads, the project airstrip, two major operational hubs, as well as miles of pipelines, with gravel mining to support these activities. Emergency Mot. Under Circuit R. 27-3, Dkt. 10.1 at 6. ConocoPhillips has begun construction. Renewed Mot. for an Injunction Pending Appeal Ex. 1, Dkt. 38.2 (filed concurrently). Once built, that infrastructure will be permanent, and the damage will be irreparable.

SILA promptly moved for an injunction seeking to halt construction of Willow during this appeal, which the District Court denied on December 1, 2023. *See* Ex. 32 to SILA's Mot. for Inj. Pending Appeal, Dkt. 10.33 (Order Re Mots. for Inj. Pending Appeal). SILA subsequently filed an emergency motion for an injunction pending appeal with this Court. Emergency Mot. Under Circuit R. 27-3, Dkt. 10.1. The motions panel denied SILA's motion "without prejudice to renewal before the merits panel," but it did not make any specific findings and expedited the appeal. Order, Dkt. 34.1 at 2. SILA is concurrently filing a renewal of its motion for an injunction pending appeal. Dkt. 38.1. The motions panel also sua sponte consolidated this case with *Center for Biological Diversity v. U.S. Bureau of Land Management*, Case No. 23-3624. Order, Dkt. 34.1 at 2.

## II. Legal Background

### A. Naval Petroleum Reserves Production Act

The Reserves Act governs BLM's management of the surface values and resources, as well as subsurface resources, in the Reserve. 42 U.S.C. §§ 6502–

6506a. Although the Reserves Act directs BLM to carry out an oil and gas leasing program, it also mandates that BLM adopt mitigation measures to protect the ecological and other values of the Reserve. 42 U.S.C. §§ 6503(b), 6504(a), 6506a(b). The Reserves Act provides that BLM "shall include or provide for such conditions, restrictions, and prohibitions" on oil and gas activities as it determines necessary to protect the Reserve's surface resources. *Id.* § 6506a(b). The statute places no limitation or conditions on this authority. Congress also instructed the Secretary of the Interior to designate any areas containing "significant subsistence, recreational, fish and wildlife, or historical or scenic value" as Special Areas. *Id.* § 6504(a). The Secretary is required to ensure "maximum protection" for surface values within designated Special Areas. *Id.*

The Reserves Act and related regulations also grant BLM considerable discretion to suspend operations and production on existing leases or units. *Id*. § 6506a(k)(2). BLM may suspend operations and production "in the interest of conservation of natural resources" or to mitigate "reasonably foreseeable and significantly adverse effects on surface resources." 43 C.F.R. § 3135.2(a). BLM also has the authority to deny or delay an application for a permit to drill, which is the final approval needed before drilling can start. *Id*. § 3162.3-1(h)(2), (3).

### B. National Environmental Policy Act

NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[3] NEPA's twin aims are to ensure that federal agencies take a hard look at the environmental impacts of proposals before taking action and to ensure that agencies provide relevant information to the public so the public can play a role in both the decision-making process and the implementation of the decision. *Id.* § 1502.1. NEPA requires federal agencies to prepare a detailed EIS for every major federal action that will have a significant impact on the quality of the human environment. 42 U.S.C. § 4332(2)(C).

An EIS is required to "provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. The alternatives analysis is the heart of a NEPA document, and NEPA's implementing regulations direct BLM to "[r]igorously explore and objectively evaluate all reasonable alternatives," including appropriate mitigation measures to reduce the potential impacts of the action on the environment. 40 C.F.R. § 1502.14.

---

[3] BLM developed the Willow SEIS under the 1978 regulations implementing NEPA, not the revised NEPA regulations promulgated in 2020. Citations in this case are, therefore, to the 2019 Code of Federal Regulations, which reflect the 1978 regulations. 1-ER-15–16 n.48.

Consistent with NEPA's basic policy objective to protect the environment via informed decision making, this includes analyzing more environmentally protective alternatives. 40 C.F.R. § 1500.2(e) (stating agencies must "[u]se the NEPA process to identify and assess reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment"); *see also Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1121–22 (9th Cir. 2002) (citing cases), *abrogated on other grounds by The Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1178–80 (9th Cir. 2011) (en banc).

In defining a "reasonable" range of alternatives, NEPA requires consideration of alternatives "that are practical or feasible" and not just "whether the proponent or applicant likes or is itself capable of carrying out a particular alternative." Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,027 (Mar. 23, 1981). "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action, and sufficient to permit a reasoned choice." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (quoting *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995)) (internal quotation marks omitted). "The existence of a viable but unexamined alternative renders an [EIS] inadequate." *Morongo*

*Band of Mission Indians v. Fed. Aviation Admin*., 161 F.3d 569, 575 (9th Cir. 1998) (quoting *Resources Ltd. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1994)).

**C. Alaska National Interest Lands Conservation Act**

Congress enacted ANILCA for the dual purposes of conservation and protecting subsistence. 16 U.S.C. §§ 3101(a)–(c), 3111–3112, 3120(a). ANILCA broadly defines "subsistence uses" as "the customary and traditional uses by rural Alaska residents of wild renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation" and the sharing of such resources for personal and family consumption. *Id*. § 3113.

Under ANILCA Section 810, if an agency is considering an action to withdraw, reserve, lease, or otherwise allow the use, occupancy, or disposition of public land, it is required to go through a number of steps to determine the proposed action's impact on subsistence uses and it has substantive obligations to avoid or minimize those impacts. *Id.* § 3120. The agency "shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." *Id.* § 3120(a). In doing so, the agency must also consider cumulative impacts. *Tenakee Springs v. Clough*, 915

F.2d 1308, 1312–13 (9th Cir. 1990); *Sierra Club v. Penfold*, 664 F. Supp. 1299, 1310 (D. Alaska 1987), *aff'd*, 857 F.2d 1307 (9th Cir. 1988).

If the agency determines that the activities will not "significantly restrict subsistence uses," then the agency issues a Finding of No Significant Restriction and Section 810's requirements are met. 16 U.S.C. § 3120(a); *see also Hanlon v. Barton*, 740 F. Supp. 1446, 1448 (D. Alaska 1988).

The agency is required to take additional steps and make additional findings if there may be significant restrictions on subsistence uses. *See* 16 U.S.C. § 3120. The agency cannot approve an action that would significantly restrict subsistence uses unless it makes specific findings. *Id.* § 3120(a). Those findings require the agency to determine whether such a restriction is necessary and consistent with sound public lands management, that the activity will involve the minimal amount of public lands necessary to accomplish its purposes, and that reasonable steps will be taken to minimize the adverse impacts on subsistence uses and resources. *Id*. § 3120(a)(3). If the agency makes a negative determination for any of these findings, the agency cannot approve the action. *See id.* The agency must also provide notice and hold hearings in potentially affected communities before it can finalize its findings and make a decision. 16 U.S.C. § 3120(a)(1)–(2); *see also Hanlon*, 740 F. Supp. at 1448.

## SUMMARY OF THE ARGUMENT

BLM's approval of Willow was unlawful. In evaluating whether and in what manner to permit Willow — the first major oil and gas facility on federal lands in the Reserve — BLM assumed at the outset of its process that it could not authorize anything less than full-field development of ConocoPhillips' leases. This assumption reflects a fundamental misapplication of BLM's broad authority and obligations under the Reserves Act. Under the statute, BLM can, and indeed must, protect surface resources and Special Areas when considering applications for oil and gas production and BLM has the authority to authorize less than full-field development. By rejecting alternatives and other measures that would have resulted in fewer impacts to the Reserve and been more protective of its Special Areas on the ground that it was required to authorize full-field development of ConocoPhillips' leases, BLM failed to comply with the Reserves Act's mandates.

BLM's failure to analyze more protective alternatives also violates NEPA, which requires that agencies consider a reasonable range of alternatives to an applicant's proposed action. In comments on the draft SEIS, SILA and others suggested numerous alternatives or components of alternatives that BLM could have considered that were viable and consistent with both the Reserves Act and Willow's purpose and need. BLM rejected these proposals as inconsistent with ConocoPhillips' lease rights and BLM's obligation to allow for full-field

development. This led BLM to consider only four action alternatives in depth — ConocoPhillips' proposed project and three slight variations of that proposal. BLM's failure to analyze a reasonable range of alternatives violated NEPA.

Finally, BLM's unlawful view of its own authority under the Reserves Act resulted in the agency violating its substantive obligations to protect subsistence under ANILCA Section 810. Consistent with ANILCA's overarching purposes of conservation and subsistence protection, ANILCA requires BLM to consider alternatives and other measures to reduce impacts to subsistence users. Specifically, Section 810 mandates that BLM evaluate alternatives to proposed uses of public lands that would minimize the use of the lands that are important for subsistence use and adopt reasonable measures to reduce the adverse impacts to subsistence users. BLM erroneously treated ConocoPhillips' lease rights and its obligations under the Reserves Act as overcoming these important, substantive mandates, in violation of Section 810.

These legal failures are serious and vacatur of BLM's approvals of Willow is warranted.

## STANDARD OF REVIEW

This Court "reviews the district court's summary judgment de novo," including its legal conclusions. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

The Administrative Procedure Act provides the standards of review for agency decision making. 5 U.S.C. §§ 702, 704. Under the Administrative Procedure Act, courts must "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if adopted without observing the legally required procedures. *Id.* § 706(2). Agencies violate this standard when they rely on factors Congress did not intend them to consider, fail to consider an important aspect of the problem, offer a decision or explanation counter to record evidence, or their actions are implausible and cannot be ascribed to a difference in view or agency expertise. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Interpretation of a statute is a question of law, and courts are "guided by the fundamental canons of statutory construction and begin with the statutory text." *Bottinelli v. Salazar*, 929 F.3d 1196, 1199 (9th Cir. 2019) (explaining courts rely on plain language when reviewing agency's statutory interpretation).

## ARGUMENT

### I. BLM VIOLATED THE RESERVES ACT AND NEPA BY UNLAWFULLY LIMITING ITS AUTHORITY AND FAILING TO CONSIDER A REASONABLE RANGE OF ALTERNATIVES.

Due to an erroneous interpretation of the Reserves Act, BLM violated NEPA's core mandate to consider a reasonable range of alternatives and the

Reserve Act's mandates to provide maximum protection for Special Areas and protect surface resources. BLM did so by improperly limiting its consideration of alternatives to only those that would allow for full-field development of ConocoPhillips' leases, thus excluding other more protective alternatives from analysis.

### A. BLM's Misinterpretation of the Reserves Act Caused the Agency to Eliminate More Protective Alternatives from Detailed Consideration.

BLM purported to evaluate a new reasonable range of alternatives in the SEIS to comply with the District Court's 2021 order. 2-ER-210 (stating that the agency no longer assumed ConocoPhillips possessed the right to extract "all possible" oil under its leases); *SILA*, 555 F. Supp. 3d at 770. However, the agency committed the same fundamental error in the SEIS as it did in its first analysis: it failed to consider more protective alternatives based on a critical, mistaken assumption about the scope of ConocoPhillips' lease rights and BLM's statutory obligations under the Reserves Act.

In developing the SEIS, BLM largely retained the prior EIS's faulty alternatives and screening criteria. 2-ER-210 ("All screening criteria from the previous Willow [] EIS were retained[.]"). BLM purported to add one additional screening criterion: to ensure alternatives would comply with the District Court's decision — i.e., the District Court's ruling that ConocoPhillips did not have the right to extract all oil and gas from its leases and that BLM must consider

alternatives more protective of Special Areas and Reserve resources. *Id*. However, BLM still eliminated alternatives on functionally the same basis.

Despite its new screening criterion, BLM still eliminated alternatives based on the nearly identical assumption that it must allow full development of the Willow reservoir. Citing 43 C.F.R. § 3137.71(b)(1), BLM defined "fully develop" to mean it could not consider an alternative that would strand an economically viable quantity of oil — meaning, a quantity that may warrant an additional drill site. 2-ER-207–09. BLM did not explain how it generated this definition or why it believed the cited regulatory provision was applicable.[4]

As a result, BLM unlawfully limited the range of alternatives to only those allowing for full-field development. For example, the agency rejected alternatives that would have kept infrastructure out of the Teshekpuk Lake Special Area, precluded infrastructure in important subsistence-use areas, reduced greenhouse

[4] *See* 2-ER-264 (explaining BLM's definition of "economically viable" and stating "BLM concluded that if [ConocoPhillips] was proposing to develop a road and pad then it was economically viable to develop"). Additionally, BLM pointed to 43 C.F.R. § 3137.71 as requiring it to allow full-field development. 2-ER-207–09*; see also* 2-ER-271. But that provision imposes requirements on lessees — not BLM — and governs their contractual obligations for continued development planning within oil and gas units. 43 C.F.R. § 3137.71(b)(1) ("If you have drilled a well that meets the productivity criteria, your plan must describe the activities to fully develop the oil and gas field."). This regulatory provision does not confer a development guarantee to lessees or limit BLM's authority to restrict or condition activities to protect the Reserve's surface resources.

gas emissions, or otherwise would have further reduced impacts — all on the ground that it was required to authorize full-field development. *See* 2-ER-229–35 (comments suggesting alternatives); 2-ER-212 (BLM explaining drill site was required in the Teshekpuk Lake Special Area because "there is an economically viable quantity of recoverable oil in this area based on [BLM's] review of the available geologic data and because there is enough resource accessible from [Bear Tooth 4 site] that [ConocoPhillips] has proposed constructing a gravel road and drill pad to access it").

From a practical standpoint, this limitation is nearly identical to BLM's prior "view that it must allow ConocoPhillips to extract all possible oil and gas on its leases." *SILA*, 555 F. Supp. 3d at 770. Allowing the extraction of all possible oil and gas from its leases is functionally the same as allowing full-field development. When presented with this similar limitation in the prior EIS, the District Court correctly held BLM acted contrary to law by failing to consider the Reserves Act's directive to provide "maximum protection" for surface values within the Teshekpuk Lake Special Area and by limiting its consideration of alternatives based on the erroneous belief that ConocoPhillips had the right to extract all oil and gas from its leases. *SILA*, 555 F. Supp. 3d at 769–70. BLM repeated this legal error in the SEIS by only considering alternatives that would allow for full-field development, and offering only a cursory rejection of reasonable alternatives that

would have better protected the Reserve's surface resources and Special Areas. *See W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1049–54 (9th Cir. 2013) (rejecting agency's environmental assessment that failed to consider feasible alternatives in detail).

Consistent with its prior reasoning, the District Court should have reached the same conclusion here: the SEIS is unlawful. Instead, the District Court concluded not only that BLM's approach was within its discretion, but also that BLM no longer retains the authority to prohibit significant impacts following lease issuance. 1-ER-24–25. This holding is contrary to the Reserves Act and Ninth Circuit precedent, as described next.

**B. BLM's Approach Violated the Reserves Act's Plain Language.**

BLM's assumption that it is required to authorize full-field development once it issues a lease disregards the plain language in the Reserves Act and its implementing regulations. 42 U.S.C. §§ 6504(a), 6506a(b); 43 C.F.R. § 3135.2(a). Nothing on the face of the Reserves Act indicates that the agency's authority or obligation to mitigate impacts ends once it issues a lease or that it can only require mitigation to the extent it still allows for full-field development. There are no temporal limitations on BLM's mitigation obligations. On the contrary, Congress' use of the word "shall" in the provisions setting out BLM's protective obligations indicates BLM's obligations are mandatory and ongoing. 42 U.S.C. §§ 6506a(b),

6506a(k)(2). The fact that the Reserves Act calls for an oil and gas program does not override the statute's mandate that protections be implemented to avoid or reduce impacts to important resources and designated Special Areas, including after lease issuance. *Id.*

The key issue here is that BLM improperly interpreted the Reserves Act to limit the scope of its authority after it issues a lease. While the District Court recognized that BLM retains some authority to mitigate impacts, it erred in holding that BLM no longer has the authority to prohibit significant impacts after lease issuance, and in upholding BLM's incorrect interpretation that it was obligated to authorize full-field development. 1-ER-24–25. As explained above, under the plain language of the Reserves Act and its regulations, BLM may restrict and even prohibit activities on existing leases, including by denying drilling permits, and it has a duty to do so when necessary to protect Special Areas and surface resources. The District Court's erroneous statutory interpretation would tie the agency's hands even where, as here, the project is likely to have significant adverse impacts to surface resources and Special Areas, contrary to the Reserves Act.

Additionally, ConocoPhillips' leases do not, and legally could not, override or waive BLM's statutory obligations to avoid and minimize significant impacts to surface resources after issuing a lease. The terms of the leases themselves make clear that ConocoPhillips' lease rights are subject to all applicable laws and

regulations. *See, e.g.*, 2-ER-273–74. This includes BLM's ability to adopt prohibitions and impose mitigation measures to protect the surface resources, ecological values, and subsistence use in the Reserve.

As the Ninth Circuit recognized in *Northern Alaska Environmental Center v. Kempthorne*, even after issuing leases, the government can still "condition permits for drilling on implementation of environmentally protective measures," and the Court presumed the agency could "deny a specific application altogether if a particularly sensitive area is sought to be developed and mitigation measures are not available." 457 F.3d 969, 976 (9th Cir. 2006).[5] As such, BLM's assumption that it could not preclude ConocoPhillips from developing economically recoverable oil was wrong. The District Court focused on the portion of *Kempthorne* discussing whether BLM could "forbid all oil and gas development" in the Reserve when adopting its overarching management plan. 1-ER-25 n.89. The issue presented here, however, is not whether BLM can or should forbid all development on ConocoPhillips' leases or prohibit all infrastructure in the Teshekpuk Lake Special Area. Rather, the question is whether BLM failed to

---

[5] While the Court in *Kempthorne* ultimately rejected Plaintiffs' arguments that BLM failed to assess a reasonable range of alternatives, BLM's basis for rejecting proposed alternatives was not based on an unlawful view of its authority, as it is here. 457 F.3d at 978–79.

consider a reasonable range of alternatives based on its erroneous assumption that it must allow full-field development after it issues a lease. *See* 2-ER-207–09. BLM's constrained view of its ability to authorize less than full-field development and the District Court's holding are at odds with the Reserves Act's plain language and Ninth Circuit precedent concerning the agency's authority.

### C. BLM's Purpose and Need Statement Did Not Preclude the Full Analysis of More Protective Alternatives.

BLM's unlawful interpretation of the Reserves Act led it to reject reasonable alternatives at the outset of its supplemental NEPA process, including other alternatives that were consistent with BLM's purpose and need. Contrary to the District Court's reasoning, 1-ER-29, -33, it does not follow that BLM complied with its statutory mandates or considered a reasonable range of alternatives simply because Alternative E made some modifications to the project, such as not approving every drill site ConocoPhillips originally proposed.[6]

Nothing in BLM's purpose and need statement precluded the agency from considering alternatives that would have allowed for less than full-field development, such as those that would shift infrastructure out of the Teshekpuk Lake Special Area or other sensitive ecosystems like the Fish Creek setback. The

[6] BLM's prior unlawful decision also did not approve every drill site ConocoPhillips proposed. *Supra* note 1.

statement identifies dual purposes to "construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources in the Willow reservoir" while simultaneously providing "maximum protection to significant surface resources within the [Reserve]." 2-ER-154–55. While reasonable on its face, BLM's interpretation and application of the purpose and need was unlawful because the agency's constrained view of its legal authority led it to eliminate from full consideration reasonable alternatives that otherwise met the purpose and need. *See, e.g.*, 2-ER-271–72 (chart deeming more protective alternatives "technologically and logistically feasible" and consistent with the District Court's 2021 decision, but contrary to ConocoPhillips' lease rights and full-field development). Even where an agency's purpose and need statement is lawful on its face, an agency fails to comply with NEPA where its EIS fails to consider "alternate ways to accomplish its stated mission." *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1097–98 (9th Cir. 2006).

BLM never explained why alternatives that would reduce infrastructure or locate it outside of sensitive areas would be inconsistent with either the first purpose (generally enabling oil and gas development) or the second purpose (providing maximum protection to the Reserve's resources). BLM's statement that such alternatives would be inconsistent with its purpose and need focused only on the first goal, and in doing so, the agency transformed the general purpose of

providing for oil and gas development into a mandate to ensure full-field development. 2-ER-212–14.

The District Court's endorsement of BLM's refusal to fully consider an alternative component without infrastructure in the Teshekpuk Lake Special Area (Component 44) as inconsistent with the purpose and need — because it would eliminate oil recovery on "several" leases within the Special Area — similarly misses the point. 1-ER-31. The purpose of allowing oil production and transportation does not override BLM's statutory obligations to protect surface resources, as discussed above. Because alternatives that reduced impacts or kept infrastructure out of the Teshekpuk Lake Special Area were consistent with the purpose and need statement, BLM's elimination of those alternatives, and any others that might involve less than full-field development, contravened both NEPA and the Reserves Act. *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013); *see also see also W. Watersheds Project v. Bernhardt*, 543 F. Supp. 3d 958, 983 (D. Idaho 2021) (rejecting agency's alternatives analysis because development and protective measures were not "mutually exclusive" or "contrary to the purpose and need").

### D. BLM's Consideration and Adoption of Alternative E Does Not Redeem Its Unlawful Interpretation and Flawed Analysis.

The addition of Alternative E in the SEIS and BLM's adoption of it as modified does not save the agency's fundamental misinterpretation of its statutory

authority and the resulting faulty analysis. All action alternatives evaluated in depth in the SEIS still included infrastructure in the Teshekpuk Lake and Colville River Special Areas and presented only small variations on ConocoPhillips' proposed project. 2-ER-175; *see also* 2-ER-162 ("Alternative E evaluates the full development of the Willow reservoir with up to four drill site pads[.]"). BLM acknowledged that an alternative rejecting infrastructure, including a drill site, in the Teshekpuk Lake Special Area (Alternative Component 44) would "theoretically … provide maximum protection to important surface resources in the [Teshekpuk Lake Special Area]," but rejected evaluating such an alternative any further because "it would not meet the Project's purpose and need and would strand an economically viable quantity of recoverable oil." 2-ER-213. BLM offered the same justifications for its refusal to evaluate alternatives that would place one of Willow's drill sites outside of the protective setback on either side of Fish Creek (Component 46). 2-ER-211; *see also* 2-ER-213–14 (explaining moving the drill site out of the Fish Creek setback would not meet the project's purpose and need because it would "strand an economically viable amount of oil" based on BLM's assessment of available data and the fact that ConocoPhillips proposed to build a drill site there). BLM's terse rejection of these potential alternative components without detailed analysis failed to account for the agency's protective mandates and authority under the Reserves Act. *Muckleshoot Indian Tribe v. U.S.*

*Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (rejecting substantially similar range of alternatives where agency rejected proposals that were "more consistent with its basic policy objectives than the alternatives that were the subject of final consideration").

BLM's elimination of the Bear Tooth 4 drill site and disapproval of a fifth drill site in its Record of Decision does not alter the fact that BLM improperly excluded reasonable alternatives from consideration based on the faulty premise that it must allow ConocoPhillips to "fully develop" the Willow reservoir. The record illustrates that BLM did not consider alternatives that would alter ConocoPhillips' oil recovery by more than a small fraction.[7] For instance, Alternative E relocated another drill site to ensure the recovery of the majority of the oil that would have been captured by Bear Tooth 4. 2-ER-162; *see also* 2-ER-186 (SEIS noting "under Alternative E, the elimination of [Bear Tooth 4] results in 15.4 million barrels (2.45%) less production relative to Alternative B"); 2-ER-266

[7] The District Court's holding that consideration of anything less than full-field development would lead to segmentation conflates distinct requirements under NEPA. 1-ER-27–28. BLM's obligation to evaluate the full scope of impacts from a project proposal does not mean the agency is obligated to consider only the most extensive version of that project or cannot consider alternatives to further reduce impacts. 42 U.S.C. § 4332(2)(C)(i); *see also NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 814 (9th Cir. 2005) (explaining agency failed to consider a reasonable range of alternatives by failing to consider allocating less than 50% of roadless areas to development).

(chart demonstrating cumulative production under Alternative E (613.45 units) would be similar to Alternative B (628.87 units)); 2-ER-268 (noting total greenhouse gas emissions "[m]ay not be materially different between action alternatives"). Indeed, BLM explained that Alternative E evaluated the "full development potential of the Willow Reservoir," and that Alternative E as adopted in the Record of Decision allows for 94% of the oil production from Alternative E as configured in the final SEIS. 2-ER-128, 2-ER-152.

In sum, refusing to consider any more protective alternatives that would provide for less than full-field development was inconsistent with the agency's authority and obligations under the Reserves Act and led the agency to unlawfully constrain its alternatives analysis under NEPA. *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (rejecting decision where agency limited consideration to alternatives allowing maximum development).

## II. BLM VIOLATED ANILCA SECTION 810'S SUBSTANTIVE MANDATES BY FAILING TO CONSIDER MORE PROTECTIVE ALTERNATIVES AND TAKE REASONABLE STEPS TO REDUCE IMPACTS TO SUBSISTENCE USES.

ANILCA Section 810's requirements to consider alternatives and take reasonable steps to reduce impacts are fundamental to achieving the statute's substantive purpose to protect subsistence. BLM wrongly cabined its Section 810 obligations based on an overly restrictive interpretation of its authority under the Reserves Act. As a result, BLM failed to consider more protective alternatives,

minimize its use of public lands, and take reasonable steps to reduce impacts to subsistence, as required by ANILCA Section 810.

ANILCA requires consideration of alternatives in a manner similar to, but also distinct from, NEPA's requirements. *See, e.g.*, 16 U.S.C. § 3120(a); *Tenakee Springs*, 915 F.2d at 1312–13; *Alaska Wilderness*, 67 F.3d at 731. A core purpose of Section 810 is to ensure not only that impacts to subsistence are adequately considered when making a decision, but also that adverse effects are actually minimized in the final decision. *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1017 (D. Alaska 2020); *see also* 16 U.S.C. § 3101(a)–(c) (explaining fundamental purpose of ANILCA is protecting subsistence). Indeed, Section 810 imposes substantive limitations on an agency's discretion to consider and select alternatives, and "an agency proceeds at its peril where it fails to include within the set of alternatives to be considered one which can be implemented in conformity with ANILCA's substantive mandate." *Tenakee Springs v. Clough*, 750 F. Supp. 1406, 1421 (D. Alaska 1990), *rev'd on other grounds*, 915 F.2d 1308 (9th Cir. 1990); *see also Angoon v. Marsh*, 749 F.2d 1413, 1419 (9th Cir. 1984) (noting that "Title VIII places restrictions on the management of public land in Alaska in order to minimize effects on Alaska residents' subsistence lifestyles"); 16 U.S.C. § 3112 (Congress declaring that the "utilization of the public lands in Alaska is to cause the least adverse impact possible on rural

residents who depend upon subsistence uses of the resources of such lands" and prioritizing subsistence uses over other consumptive uses). Section 810 is, therefore, intended to provide the agency and public with information about subsistence impacts and ensure that the agency affirmatively minimizes impacts from the proposed action before making its decision. The statute is not merely procedural. *See Amoco Prod. Co. v. Vill. Of Gambell, AK*, 480 U.S. 531, 544 (1987) (noting "the underlying substantive policy the process was designed to effect [is the] preservation of subsistence resources").

To achieve this, the first sentence of Section 810(a) states that "[i]n determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands," the agency is required to evaluate "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes," in addition to evaluating the effects of a project and the availability of other lands. 16 U.S.C. § 3120(a). This plain language illustrates that the agency's consideration of alternatives relates to the overarching determination of whether and how to permit the use of public lands. That analysis is closely related to and informs the requirements in the second sentence of Section 810(a), which prohibits authorizing a use if it would cause significant restrictions, absent the agency making additional findings as set out in Section 810(a)(3). *Id.* § 3120(a) (stating in the second

sentence that "[n]o such withdrawal, reservation, lease, permit, or other use, occupancy or disposition of such lands which would significantly restrict subsistence uses shall be effected" until the agency makes the required findings in § 3120(a)(3)). Those additional findings include the related substantive requirements for the agency to determine that "the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy or other disposition" and that "reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions." *Id.* § 3120(a)(3).

All of these provisions are collectively aimed at fulfilling ANILCA's policy to ensure public lands in Alaska are utilized in a manner which will "cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands." *Tenakee Springs*, 915 F.2d at 1310–11 (quoting 16 U.S.C. § 3112(1)); *see also* 16 U.S.C. §§ 3111–3112. As such, Section 810(a)'s alternatives requirement is not simply a lens for determining whether there may be significant impacts to subsistence. Instead, when properly interpreted and put into the context of Section 810 and ANILCA more broadly, the alternatives component in Section 810(a) requires the agency to consider alternatives that will reduce subsistence impacts. *Slaven v. BP America*, 973 F.2d 1468, 1472 (9th Cir. 1992) (explaining that courts must consider a statutory provision "in light of the overall

structure and purpose of the legislation"). The agency's consideration of alternatives that will reduce impacts directly informs and relates to the substantive requirements for the agency to determine it is authorizing the use of only the minimum amount of public lands necessary and has taken reasonable steps to minimize adverse impacts.

As discussed above, BLM improperly limited the scope of its alternatives analysis based on its unduly narrow view of its legal authority. *Supra* Argument Part I.A–B. BLM improperly interpreted ConocoPhillips' lease rights and the Reserves Act to mean BLM was required to authorize full-field development. *Supra* Argument Part I.B. Although the Reserves Act authorizes an oil and gas program, nothing in the statute overrides the agency's concurrent obligation to reduce the impacts of oil and gas activities to subsistence under Section 810. *See* 42 U.S.C. § 6506a(a)–(b). BLM's failure to consider more protective alternatives based on its misinterpretation of the Reserves Act violates Section 810.

Because BLM limited its consideration of alternatives to only those that would allow for full-field development, it did not adequately consider alternatives that would "reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." 16 U.S.C. § 3120(a); *see supra* Argument Part I.A–B. In its Section 810 analysis, BLM explained that it eliminated a number of alternatives from analysis "due to economic, or technological feasibility or

practicability, or because they did not meet the purpose of the proposed action to produce the oil discovered on [ConocoPhillips'] leases." 2-ER-215. As a result, BLM improperly limited the scope of its alternatives by relying on the erroneous assumption that it could not strand economically viable quantities of recoverable oil. *See, e.g.*, 2-ER-212, 2-ER-152, 2-ER-271–72; *see also supra* Argument Part I.A. BLM also failed to reasonably explain why reducing infrastructure on lands relied upon by subsistence users was inconsistent with the dual purposes of the proposed action (i.e., to "construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources in the Willow reservoir" while simultaneously providing "maximum protection to significant surface resources within the [Reserve]"). 2-ER-154–55. It is not. *See supra* Argument Part I.C.

The District Court erred by treating Section 810's alternatives requirement as only informing the question of whether the proposed action may significantly restrict subsistence uses. The court treated BLM's alternatives analysis as simply "one factor" it needed to consider in determining whether the proposed action and the other alternatives contained in the SEIS may significantly restrict subsistence uses. 1-ER-54. Based on that incorrect framing, the court improperly concluded that BLM was not required to consider additional alternatives that would further minimize the use of public lands. 1-ER-53–55. This interpretation is contrary to the

plain statutory language, as set out above, and it would eviscerate the substantive requirements and policy behind Section 810. Considering alternatives under Section 810 is not done solely to inform a determination of whether the action may significantly restrict subsistence uses and an agency is not relieved of the obligation to consider alternatives that better protect subsistence once the agency determines there may be significant restrictions. 16 U.S.C. § 3120(a). Such an interpretation would also be contrary to Ninth Circuit case law. The Ninth Circuit in *Tenakee Springs* made it clear that Section 810 substantively requires agencies to consider reasonable alternatives to a proposed action and that the provisions are "intended to minimize the impact of a proposed project on resources which rural village residents of Alaska use for subsistence." 915 F.2d at 1310–11; *see also Alaska Wilderness*, 67 F.3d at 731 (recognizing the need to consider alternatives and minimize subsistence impacts).

Similarly, this Court's reasoning in *Kunaknana v. Clark* does not stand for the proposition that BLM's obligations under Section 810 are limited by the Reserve's oil and gas program. *Kunaknana* specifically considered BLM's Section 810 mandates at the leasing stage, but the Court recognized the agency was still obligated to protect subsistence at later stages of oil and gas development as well. 742 F.2d 1145, 1152 (9th Cir. 1984); *contra* 1-ER-56 n.226. While subsistence impacts may not override all other uses, the same is also true of the Reserves Act's

oil and gas program: it does not override BLM's concurrent obligation to minimize impacts to subsistence use pursuant to Section 810 and ANILCA's overarching purpose to protect subsistence when authorizing uses of public lands. *See Kunaknana*, 742 F.2d at 1150–51; 42 U.S.C. § 6506a(a)–(b).

In *Tenakee Springs*, the Ninth Circuit considered and rejected similar arguments that an agency's contractual obligation with industry should preempt laws designed to protect subsistence, including Section 810. 915 F.2d at 1312. The Court found that, where an agency improperly confines the scope of its authority under a statute or contract and thereby limits its consideration of alternatives, it acts contrary to the substantive purpose of Section 810 to minimize impacts to subsistence. *Id.* Similar to *Tenakee Springs*, BLM's interpretation of ConocoPhillips' lease rights and the Reserves Act as requiring full-field development led BLM to improperly constrain its consideration of alternatives. As a result, BLM failed to consider alternatives that would have reduced the use and occupancy of public lands needed for subsistence, in violation of Section 810. 16 U.S.C. § 3120(a).

BLM's consideration of Alternative E did not cure these fundamental legal flaws. In considering Willow's likely impacts to subsistence, BLM concluded that all of the action alternatives would cause significant restrictions to subsistence. 2-ER-260–63. In the final SEIS, BLM claimed that it considered ways to reduce

impacts to subsistence users under Alternative E, but it also acknowledged that none of the action alternatives meaningfully reduced the use and occupancy of lands needed for subsistence purposes. 2-ER-216. While BLM found the reduction in infrastructure in Alternative E "could lessen the frequency or severity of deflection of caribou," BLM also found that, even with those changes, "many caribou would still encounter roads, including the pinch point where the access road intersects with infield roads, during their migration south."[8] 2-ER-216. When looking at indirect impacts, BLM concluded overall that only a "slightly smaller percentage of Nuiqsut harvesters (88%) would be affected under Alternative E compared to Alternative B (91%)," with that difference largely relating to goose hunting, not caribou hunting. *Id*. BLM similarly concluded that, "while the decrease in infrastructure within the [Teshekpuk Lake Special Area] may reduce deflection of caribou and lessen impacts on resource availability for Nuiqsut harvesters, the difference in direct impacts on caribou hunters would be minimal." 2-ER-216. Even with the changes in Alternative E, BLM concluded the project "is likely to deflect … caribou from areas where Nuiqsut hunters harvest them." 2-ER-

[8] The elimination of the Bear Tooth 5 drill site did not change this impact because caribou would be most harmed during their migration south by Willow's east to west infrastructure, such as the access road; the pinch point of converging access and in-field roads, which was of particular concern for caribou impacts, stayed the same. 2-ER-121 (map of selected project).

217. Despite all of these findings, BLM still did not evaluate other alternatives to further reduce impacts because it limited its consideration to only those alternatives authorizing full-field development. By constraining its view of its legal authority in this way, BLM failed to consider other alternatives or take steps to more meaningfully reduce the impacts to subsistence use.

As a result of its misinterpretation of its statutory authority, which led to an overly restricted range of alternatives, BLM's findings that its decision involved the minimum amount of public lands necessary and included reasonable steps to reduce impacts to subsistence were similarly arbitrary and capricious. 16 U.S.C. § 3120(a)(3)(B)–(C); 2-ER-144–47. Those assertions are unsubstantiated and not entitled to deference because BLM operated under the assumption it could not consider alternatives or mitigation measures that would authorize less than full-field development. *See, e.g.*, 2-ER-212. Had BLM not misinterpreted its legal authority and mandates to limit the scope of its analysis, it could have considered other reasonable measures to minimize Willow's impacts to subsistence and ensure its decision involved the minimum amount of public lands necessary.

In sum, BLM failed to comply with ANILCA Section 810 by improperly limiting its obligations to minimize impacts to subsistence based on an overly stringent interpretation of the Reserves Act. As a result, BLM failed to comply with ANILCA's mandate to consider alternatives that would reduce impacts to

subsistence based on the agency's flawed assumption that it had to allow full-field development. Its related findings that its approval involved the minimum amount of public land necessary for the project and included reasonable measures to minimize subsistence impacts were also arbitrary and capricious.

## III. THE COURT SHOULD VACATE BLM'S DECISIONS.

Vacatur is the presumptive remedy under the Administrative Procedure Act. 5 U.S.C. § 706(2); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1901 (2020); *350 Mont. v. Haaland*, 50 F.4th 1254, 1259 (9th Cir. 2022). The Court should apply this presumptive remedy and vacate the Record of Decision, final SEIS, and all permits and authorizations.

Defendants may argue that vacatur is not warranted. Remanding without vacating occurs only in "rare" or "limited circumstances." *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010); *Pollinator Stewardship Council v. U.S. EPA* (*Pollinator*), 806 F.3d 520, 532 (9th Cir. 2015); *see also Wood v. Burwell*, 837 F.3d 969, 976 (9th Cir. 2016) (noting remand without vacatur "used sparingly in this circuit"). In determining whether to depart from the default remedy, this Court considers whether vacatur would cause environmental harm. *Nat'l Family Farm Coal. v. EPA*, 960 F.3d 1120, 1144–45 (9th Cir. 2020); *NRDC v. U.S. EPA*, 38 F.4th 34, 51–52 (9th Cir. 2022). This Court also "weigh[s] the seriousness of the agency's errors against the disruptive consequences of an

interim change that may itself be changed." *Nat'l Family Farm Coal.*, 960 F.3d at 1144 (citation omitted). As an equitable defense, the burden is on the Defendants to show that the Court should deviate from the default remedy. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121–22 (9th Cir. 2018). They cannot.

Most importantly, there will be no environmental harm from vacatur. Instead, vacatur will protect the Reserve and the people that rely on it from additional and ongoing expanded gravel mining and construction of permanent gravel roads, drill sites, and other extensive infrastructure. This alone weighs heavily in favor of vacatur. *See Pollinator*, 806 F.3d at 532 (vacating where leaving rule in place "risks more potential environmental harm"); *cf. Ctr. for Food Safety v. Regan*, 56 F.4th 648, 668 (9th Cir. 2022) (remanding without vacating to maintain environmental protections from pesticide registration); *California Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (declining to vacate rule where vacatur would increase air pollution); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995) (not vacating because it could lead to "potential extinction" of species).

Regarding the seriousness of the error, BLM's legal violations go to the core purposes of the statutes and are consequential to the agency's approval of Willow. The Reserves Act requires maximum protection of Special Areas and protection of all surface resources as part of BLM's administration of the oil and gas program.

42 U.S.C. §§ 6504(a), 6506a(b). A fundamental purpose of NEPA is to ensure agencies have information about the impacts of a proposal to make an informed choice before taking action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The alternatives analysis is the "heart" of an EIS and the failure to consider a reasonable alternative renders an EIS inadequate. 40 C.F.R. § 1502.14; *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 865, 868 (9th Cir. 2004). ANILCA Section 810 protects subsistence uses and users in land management decisions. 16 U.S.C. §§ 3111, 3112, 3120. BLM's violations of these statutes are serious.

The disruptive consequences of vacatur are evaluated in light of the likelihood that a decision will remain unchanged following remand and are entitled to less weight if a different decision "may be reached." *Pollinator*, 806 F.3d at 532. Here, it is unlikely that BLM could reach the same decision following remand given that the legal errors are substantive breaches of statutory mandates and are based on invalid legal justifications. *See NRDC*, 38 F.4th at 51–52 (vacating because not possible to predict if agency would reach same outcome). Additionally, Defendants' possible arguments regarding disruptive economic harms do not overcome the presumptive remedy of vacatur. *See, e.g.*, *Nat'l Family Farm Coal.*, 960 F.3d at 1144–45 (vacating despite financial impacts to farmers); *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d

91, 106 (D.D.C. 2017) (recognizing not vacating based on economic impacts may incentivize companies to spend more up front to defeat vacatur); *cf. Sierra Club v. Trump*, 929 F.3d 670, 706 (9th Cir. 2019) (declining to enter a stay despite significant economic harms because "[p]lacing significant weight on financial obligations that Defendants knowingly undertook would, in effect, reward them for self-inflicted wounds"); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (explaining that companies that presume permitting outcomes assume economic risks). This is especially so where vacatur protects the Reserves' resources and users from harms. *See supra* Argument Parts II–III. In sum, the default remedy of vacatur is warranted.

## CONCLUSION

BLM violated the Reserves Act, NEPA, and ANILCA in approving Willow. This Court should reverse the District Court's decision to the contrary and vacate BLM's Record of Decision, final SEIS, and any approvals or decisions made in reliance upon it.

Respectfully submitted this 29th day of December, 2023.

s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA
121 W. Fireweed Lane, Suite 105
Anchorage, AK 99503
(907) 276-4244

bpsarianos@trustees.org
sbostrom@trustees.org
bbrisson@trustees.org

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that: This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32-1(a) because this brief contains 10, 457 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Word 2016 Times New Roman 14-point font.

*/s/ Bridget Psarianos*
Bridget Psarianos

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system, which will send electronic notification of such filings to the attorneys of record in this case.

*/s/ Bridget Psarianos*
Bridget Psarianos

**STATEMENT OF RELATED CASE**

9th Cir. Case Number(s): No. 23-3627 (consolidated with No. 23-3624)

Pursuant to Circuit Rule 28-2.6, the undersigned attorney or self-represented party states the following:

[ ] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[X] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

This case is consolidated with *Center for Biological Diversity v. U.S. Bureau of Land Management*, Case No. 23-3624. Order, Dkt. 34.1 at 2.

*/s/ Bridget Psarianos*
Bridget Psarianos